

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**ALEXANDRIA DIVISION**

FILED

2026 FEB 27 P 3: 44

|  |  |
|---|---|
| **MICHAEL MWAMBA,**<br><br>Pro Se Plaintiff,<br><br>v.<br><br>**AVIS BUDGET GROUP, INC.,**<br>**AVIS BUDGET CAR RENTAL, LLC,**<br>and<br>**AB CAR RENTAL SERVICES, INC.**<br><br>Defendants | Civil Action No. 1:26 CV 599 |

## COMPLAINT

## JURY TRIAL DEMANDED

## INTRODUCTION

1. I bring this action against Avis Budget Group, Inc., Avis Budget Car Rental, LLC, and AB Car Rental Services, Inc. (collectively, "Defendants" or "Avis") for systematic wage theft, retaliation for protected wage complaints, and fraud. Over a period spanning at least 2023 through 2025, Defendants underpaid me through manipulated commission calculations, suppressed performance multipliers, facilitated diversion of my rental revenue by other rental agents, and imposed erroneous payroll deductions. My District Manager John Wojcik repeatedly promised me corrections.

2. By mid-2025, things got worse, when Defendants began touching my hourly wages and sick time, the basic non-discretionary components of my pay. When I complained openly, Defendants suspended me without pay within days of my written complaint and subsequently terminated my employment

within approximately five hours of learning that I had filed a charge with the National Labor Relations Board. An independent government agency (the Virginia Employment Commission) subsequently determined that Defendants' stated grounds for termination did not establish misconduct, confirming what the evidence makes plain: I was fired for exercising my legal rights, not for any legitimate business reason.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction under 28 U.S.C. section 1331 over my claims arising under the Fair Labor Standards Act, 29 U.S.C. section 201.

4. This Court has supplemental jurisdiction under 28 U.S.C. section 1367 over my state law claims, which arise from a common nucleus of operative facts.

5. Venue is proper in this District under 28 U.S.C. section 1391(b) because a substantial part of the events giving rise to my claims occurred at Dulles International Airport location in Sterling, Virginia.

## PARTIES

6. I, Michael Mwamba, am an adult individual residing in Herndon, Virginia.

7. Avis Budget Group, Inc. is a publicly traded corporation incorporated in Delaware and headquartered in Parsippany, New Jersey. It is the parent holding company of the Avis Budget family of companies.

8. Avis Budget Car Rental, LLC is a Delaware limited liability company registered to transact business in Virginia (SCC Entity ID: T0296436), and is a wholly owned subsidiary of Avis Budget Group, Inc. This entity is the primary operator of the car rental business at Washington Dulles International Airport.

9. AB Car Rental Services, Inc. is a subsidiary of Avis Budget Car Rental, LLC and is a Delaware corporation registered to do business in Virginia as a foreign

2

corporation. AB Car Rental Services, Inc. is the entity that directly employed me at the Dulles International Airport location.

10.     Defendants Avis Budget Car Rental, LLC and AB Car Rental Services, Inc.'s shared registered agent is Corporation Service Company, 100 Shockoe Slip, Floor 2, Richmond, Virginia.

11.     All named Defendants were always my employer or joint employer relevant to this action and are jointly and severally liable for the conduct alleged herein.

## FACTUAL ALLEGATIONS

### A. Employment History

12.     I started working for Avis on June 20th, 2022, as a Rental Sales Agent at the Dulles International Airport location.

13.     In July 2023, Avis moved the Preferred Services operations to a separate standalone building on the airport premises. Of all the Rental Sales Agents, I was the only one who agreed to move to the newly built Preferred booth on the condition I would be on an "adjusted" commission incentive plan. From then on, I worked exclusively in the Preferred Services booth, serving primarily business rental customers.

14.     John Wojcik ("Wojcik") is the District Manager. He oversees all operations at the Dulles location. He personally controlled and administered the "adjusted" Commission Sales Incentive plan for Preferred Services agents.

15.     My Sales Performance Manager was Jordan Roberts ("Roberts"). He was responsible for staff sales coaching, generating Performance Commission Reports, and correcting and entering sales contracts into Avis internal compensation systems.

3

16. Newton Carey was the Support Manager and the primary technical administrator of payroll systems at the Dulles location. His authority extended beyond his nominal official position. He exercised authority to unilaterally delay, deny, and/or modify my commission-related transactions. His working knowledge of the Avis Rental Management System (Wizard) gave him the ability to manipulate agent attributions and transaction records after the fact.

17. My direct supervisor was Airport Manager Moslem Mangal ("Mangal").

18. Employees at the Dulles location are represented for collective bargaining purposes by Teamsters Local 922.

19. My compensation consisted of an hourly wage (tied to the collective bargaining agreement) and sales-based commissions with customer service multipliers tied to Net Promoter Scores ("NPS"). Wojcik created an "adjusted" Commission Sales Incentive plan (the Adjusted CSI plan) specifically for me as a Preferred Services Representative. As far as I know, only two other employees had this plan.

20. The Adjusted CSI plan was a lowered commission structure created to incentivize Preferred Services Representatives, specifically to account for Preferred Services' unique transaction flow, lowering revenue thresholds to offset the loss of other revenue streams like Budget and core Avis rental sales found at the main rental counters.

21. I had no independent access to the systems Defendants used to calculate my compensation. Every number on my pay statements originated from a chain of internal systems controlled exclusively by Defendants and administered manually by Wojcik. The technical detail of this data pipeline is out in the accompanying Memorandum in Support.

22. Under this compensation structure, my gross annual income was approximately $100,000.

**B. The Systematic Wage Underpayments**

23. Beginning no later than August 2023 and continuing through at least my termination in November 2025, I identified recurring discrepancies between the compensation I earned, and the compensation Avis actually paid me. For most of 2023 and 2024, some individual managers would promptly fix discrepancies, but those were limited to what was outside Wojcik's control of the Adjusted CSI plan.

24. For the Adjusted CSI plan, I had to raise those issues directly (and often repeatedly) to Wojcik. He was good at assuring me they would be corrected. I relied on those promises. And then, on around the spring of 2025, things got worse. Defendants began manipulating my hourly wages and sick time -- non-discretionary components of my compensation governed by law and the collective bargaining agreement. That escalation is what triggered my formal written complaints and, ultimately, this action.

25. These "discrepancies" included erroneous overtime deductions, failure to pay sick time, unprocessed commission contracts, suppressed or misapplied customer service multipliers, diverted rental agreement commissions, and distorted performance records that reduced my bonus payouts.

Overtime Clawback

26. During the pay period of July 19 to August 1, 2025, Defendants reduced my pay by negative twelve (-12) overtime hours (effectively an overtime "clawback") without any verbal or written explanation.

Sick Pay Manipulation

27. During the pay period of May 10 to May 23, 2025, I timely called out sick for my shift on May 14, 2025. Although my absence was recorded, Defendants failed to pay sick time. After I complained, they added 8 hours of sick pay to my subsequent paycheck but simultaneously deducted 8 hours from my regular hourly pay, resulting in no net correction.

Unprocessed Commission Contracts

28. During Performance Period 7 (06/07/25–07/04/25), I discovered discrepancies between my actual revenues and what was reported on Roberts Performance Commission Reports. I immediately brought this to Roberts'

attention; in a text message he acknowledged that some contracts I had timely submitted were not processed and assured me they would "Carry-forward" to the next Performance Period (PP8)

29.    On or about August 5, 2025, Roberts confirmed by text message that he had entered my contracts for Performance Period 8 (07/05/25–08/01/25), reporting total revenue of $14,599. In the same message, Roberts said the last six contracts could not be entered "due to time" and would "go towards the next pay period." On or about August 14, 2025, Roberts confirmed he had transferred those contracts into Performance Period 9. Wojcik has refused to provide me with the Performance Period 9 wage statement.

Suppressed Customer Service Multiplier

30.    The Adjusted CSI plan included a customer service multiplier applied to my total commission payout based on my NPS score for each performance period. Under Defendants own written threshold table, an NPS score of 40.0 to 49.9 qualified for a 5% multiplier, and a score of 50.0 or above qualified for a 10% multiplier.

31.    I qualified for the multiplier in Performance Periods 5, 6, and 7 (April through July 2025). Wojcik's own spreadsheets showed my qualifying NPS scores in one column and $0.00 in the Customer Service Multiplier column immediately adjacent. He sent these spreadsheets to me with congratulatory messages — "Nice month!" and "PP6 Booth Tiers. Nicely done sir." — while transmitting documents that zeroed out the payouts.

32.    In August 2025, Wojcik also failed to apply a separate 10% customer service multiplier adjustment. He acknowledged by text that he had only paid me only $54 — instead of the $372. This was not new. In April 2024, it occurred and Wojcik promised to correct it. he issued $158. across two periods, less than the underpayment for one period alone. A complete breakdown of this is outlined in the Supporting Memorandum

August 2025 Pay Discrepancy

33.    On or about August 29, 2025, I received a paycheck of approximately $2,709, However, the wage statement Wojcik gave me indicated my payout

was $6,051 — a discrepancy of $3,342 I immediately contacted Wojcik by text. He acknowledged "the discrepancy," stated "I will get on it," and requested information from me he already had access to. I provided it to him anyway. He never provided a resolution or corrected payment.

<u>Revenue Diversion</u>

34. Beginning no later than July 2023 and continuing through at least March 2025, Defendants' employees: Newton Carey (the support manager), Kathy Delridge (the Union Shop Steward) and Mesky Downing (a lead agents at the main counters) closed my active rental agreements and reopened them under their own names, diverting my revenue to their commission ledgers. Each diverted contract reduced my reported revenue, which in turn suppressed my commission calculations, multiplier eligibility, and leaderboard rankings. I reported this to Wojcik and Roberts repeatedly. They acknowledged it and did nothing. All three incidents are documented, and the details are outlined in the accompanying Support Memorandum.

**C. My Formal Written Complaints**

35. On or about August 14, 2025, I gave Mangal and Roberts written memos titled "Payroll and Revenue Reporting Issues."

36. In the memo I documented specific payroll discrepancies including the erroneous overtime deductions, improper sick pay handling, unprocessed commission contracts, suppressed NPS bonuses, and distorted performance records.

37. Despite receiving my formal written complaint, Defendants failed to investigate, correct, or adequately respond to the documented discrepancies.

**D. My Protected Activity and Defendants Retaliation**

38. In addition to my formal written complaint to management, I repeatedly raised wage discrepancy concerns through internal channels throughout 2025, including verbal complaints to Wojcik, Roberts, and Mangal. I worked

physically closer to Mangal, and I verbally followed up with him at least every other day between August 14, 2025, and September 18, 2025.

39.    I discussed my wage issues with my coworkers, Nicky, Darlene, and Etenish Tefera. A week or two before my suspension, Tefera told me she had similar pay discrepancy issues. She said she had given up.

40.    I advised at least one coworker, Mengistie Bitew, to file a charge with the National Labor Relations Board regarding a separate workplace dispute.

41.    On September 9th, 2025, I spoke with Wojcik in the Preferred Services booth about my pay issues. Wojcik stated he would "make sure he got to the bottom of the issues" within three days. This was the last substantive communication I had with Wojcik before my suspension. My coworker Darlene was present during this conversation.

42.    On or about September 15, 2025, I communicated to my coworker Nicky that I intended to pursue "other options for escalation" to address my unresolved pay issues.

**E. Defendants Pretextual Suspension**

43.    On September 18, 2025, just three days after I indicated I would escalate my complaints and nine days after Wojcik's self-imposed deadline to resolve my pay issues, Mangal texted me to go meet him in his office.

44.    Mangal asked me to provide a written statement regarding a complaint about a rental transaction. While in his office hastily drafting the statement from my laptop, he asked me if I wanted to have a witness present. He suggested Mesky or another employee. I declined and requested Arthur Mosley.

45.    Mr Mosley joined us while I was still drafting the statement. After I emailed him the statement, Mangal printed it and had me to sign it. Mangal then said he would ask "clarifying" questions as we reviewed the statement together. Despite having no prior disciplinary history in over three years of employment,
Mangal suspended me without pay a few minutes later.

**46.**     The suspension notice he handed me lacked any meaningful details other than an investigation into alleged "unauthorized rental transactions."

**F. The Grievance Process**

**47.**     On September 26, 2025, I contacted Union Shop Steward Kathy Delridge by text message about filing a grievance challenging my suspension. Delridge responded in a text that said, "Busy busy need to make money" and sent me contact information for Union President Tim Brown. Delridge — the same person who had been reassigning my rental contracts to her own commission ledger — clearly had a direct, financial conflict of interest in my case.

**48.**     On September 30, 2025, I wrote the grievance myself and filed it by email it to the union email and cc'd Tim Brown.

**49.**     On or about October 2, 2025, a Step 1 grievance meeting was held via Zoom. Present were Wojcik, HR Business Partner Marlon Spencer, Union President Tim Brown, and me. Kathy Delridge attempted to join the meeting. I told her she could not participate because she had refused to help me from the beginning. I asked my witness, Arthur Mosely, could attend instead. Wojcik refused, stating that Tim Brown was there from the union and that "was enough."

**50.**     During the October 2nd meeting, Wojcik questioned me about the same rental transactions Mangal did.  Details of that meeting are outlined in the support Memorandum.

**51.**     I showed him a report demonstrating that at least two actions on the disputed rental had been taken under my employee number at the Fort Lee, New Jersey branch, a location I have never worked at and could not have accessed without physically being there. Wojcik did not address or explain the Fort Lee evidence. Tim Brown said little and did not advocate on my behalf. The meeting ended abruptly due to Zoom connection issues. I offered to meet in person, but Defendants refused.

**52.**     A second meeting was scheduled for October 3, 2025. Before that meeting, I told Tim Brown I wanted to consult with a lawyer. Brown told me that if I

talked to a lawyer, Brown would no longer help me. Shortly after, Wojcik cancelled the October 3 meeting. I did not hear from Defendants or the union again for twelve days.

53.    On October 15th, 2025, Wojcik denied my grievance, citing "dishonesty & theft." Wojcik, the District Manager who had personally controlled my compensation spreadsheets for over two years, who had been on written notice of my wage complaints since at least November 2023, and who had a direct interest in the outcome of any wage-related grievance, served as the sole decision-maker on my Step 1 grievance.

54.    On October 17, 2025, I filed a formal appeal under Article 9 of the collective bargaining agreement. In the appeal, I detailed the Fort Lee audit trail evidence and challenged the "dishonesty & theft" finding as unsupported.

55.    On or about October 22, 2025, an appeal meeting was held via Zoom. Wojcik, the same person who had denied my grievance at Step 1, presided over my appeal. There was no higher authority reviewing his decision. Tim Brown left the meeting at some point. When Brown returned, he said he "did not do anything because I had said I wanted to talk to a lawyer." Brown then stated that the employer "does not have to follow the steps precisely" and could "move forward even with my appeal." The Zoom call ended abruptly.

56.    The grievance process produced no resolution before my termination on November 12, 2025. Wojcik served as both the Step 1 decision-maker and the authority on my appeal. Tim Brown threatened to withdraw representation if I sought legal counsel. The grievance was not a good faith attempt to resolve my complaints. It was a mechanism for running out the clock while Defendants built their termination case.

### G. The NLRB Charge and My Immediate Termination

57.    On or about November 10, 2025, I filed a charge with the National Labor Relations Board ("NLRB"), Case No. 05-CA-374722, alleging that my suspension constituted unlawful retaliation for protected concerted activity.

The charge arose directly from the same wage complaints that form the basis of this action.

58. On November 12, 2025, at approximately 12:14 p.m., Airport Manager Mangal contacted me regarding my Personal Rental Car, which was unrelated to my employment. During this communication, I informed Mangal that I had filed a charge with the NLRB and provided photographic confirmation of the filing.

59. At approximately 5:08 p.m. on the same day, I received a call from Mangal. He told me he had Wojcik on speaker phone. Wojcik proceeded to terminate my employment. Five hours. That is how long it took Defendants to fire me after finding out about my NLRB charge. I was terminated the same business day I told my manager about the filing.

60. I received my termination letter only after repeatedly requesting it. The letter, dated November 12, 2025, accused me of "dishonesty" and cited CBA provisions that purportedly allowed termination without prior warning.

61. On November 14, 2025, two days after my termination, I emailed Wojcik (copying Tim Brown and Marlon Spencer) demanding:

    1) identification of what company property Defendants believed I possessed;

    2) an explanation of how I was supposed to submit my outstanding sales contracts for final pay processing; and

    3) the CSI projected payout statements for Performance Periods 7, 8, 9, and 10.

Wojcik never responded to any part of this written demand.

62. I received a direct deposit on November 21st, 2025, of $167 as my final paycheck. Defendants did not provide me with a paystub for that as well.

**H. Independent Government Agency Findings**

63. On January 26, 2026, the Virginia Employment Commission ("VEC") issued a Decision of Deputy regarding my claim for unemployment benefits. After reviewing evidence from both parties, the VEC determined: "The information

presented does not establish that the claimant was discharged due to misconduct connected with work." The VEC's determination remains in effect and has not been appealed by Defendants.

64.    The VECs independent finding that Defendants failed to establish misconduct directly contradicts Defendants' stated basis for termination and supports my contention that the termination was pretextual.

65.    On February 13, 2026, the Virginia Department of Labor and Industry ("DOLI") accepted my Claim for Unpaid Wages (LL-POW-01, totaling $16,330.08) and my Retaliation Claim (LL-RPW-01) for formal investigation.

66.    Three charges remain pending before the NLRB, Region 5 Baltimore:
- Case Nos. 05-CA-374722 (unlawful suspension),
- 05-CA-374924 (retaliatory discharge), and
- 05-CB-375051 (duty of fair representation against Teamsters Local 922).

### I. Defendants Ongoing Retaliatory Conduct

67.    Following my termination, Defendants have continued to engage in conduct designed to isolate me and discourage other employees from communicating with me.

68.    On or about December 24, 2025, Nicky told me that Newton Carey, had been pressuring her to block my phone number. Nicky said throughout her shift that day, Carey repeatedly bugged her to cease all communication with me.

69.    Defendants HR Business Partner, Marlon Spencer, monitored my social media accounts, from approximately December 2024 through April 2025, months before my formal wage complaint and NLRB filing. This pre-termination surveillance demonstrates that Defendants had developed animus toward my outside activities well before my formal escalation.

### J. Disparate Treatment

70.    Defendants' purported zero-tolerance approach to dishonesty is selectively applied. Kathy openly and routinely drove her personal rental car to the Avis pumps to steal fuel. Wojcik's knowledge of this documented in our grievance

communications – an outright violation of company policy. Kathy has not been terminated. This disparate treatment further demonstrates that Defendants stated reasons for my termination are pretextual.

**K. Damages**

71.   All of this caused me real harm, including: unpaid wages, commissions, and bonuses believed to exceed $16,000; suppressed customer service multipliers totaling a documented minimum of $6,208; diverted commission revenue totaling a documented minimum of $2,695; lost wages and benefits from September 18, 2025 through the present at approximately $1,923 per week; loss of employment and career advancement opportunities; emotional distress, humiliation, and damage to professional reputation; ongoing housing insecurity; and other consequential damages.

72.   In total, my damages are believed to exceed $134,000 and continue to accrue.

## CLAIMS FOR RELIEF

## COUNT I
### FAIR LABOR STANDARDS ACT –RETALIATION
### 29 U.S.C. Section 215(a)(3)

73.   I incorporate by reference all preceding paragraphs as if fully set forth herein.

74.   Section 15(a)(3) of the Fair Labor Standards Act prohibits employers from discharging or discriminating against any employee because such employee has filed any complaint or instituted any proceeding under or related to the FLSA.

75.   I engaged in protected activity under the FLSA by complaining internally about Defendants'   failure to properly pay overtime wages, including specifically the unexplained deduction of twelve (12) overtime hours from my pay during the pay period of July 19 to August 1, 2025.

76. My August 14, 2025, written memorandum to management documenting "Payroll and Revenue Reporting Issues," including the overtime deduction, was protected activity under the FLSA.

77. Defendants were aware of my protected complaints.

78. As of approximately 12:14 p.m. on November 12, 2025, Defendants had actual knowledge that I had filed a charge with the NLRB arising from those same wage complaints. Defendants took adverse employment actions against me, including suspension without pay on September 18, 2025, and termination on November 12, 2025.

79. There is a direct causal connection between my protected activity and Defendants adverse actions, as evidenced by:
(a) the temporal proximity between my written wage complaint and my suspension (approximately 34 days);
(b) the temporal proximity between my disclosure of my NLRB charge and my termination (approximately five hours);
(c) defendants failure to address my documented wage concerns before taking adverse action;
(d) defendants' reliance on fabricated or manipulated system records to justify termination;
(e) the VECs independent finding that Defendants failed to establish misconduct;
(f) Defendants' disparate treatment of me compared to other employees who committed documented policy violations; and
(g) Defendants' ongoing efforts to interfere with my communications with former coworkers who are potential witnesses.

80. Defendants' stated reasons for my termination are pretextual. Defendants violations were willful.

81. I am entitled to reinstatement, back pay, front pay, liquidated damages, compensatory damages, attorney fees, and costs pursuant to 29 U.S.C. section 216(b).

# COUNT II

## VIRGINIA WAGE PAYMENT ACT – RETALIATION
## Va. Code section 40.1-33.2

82.    I restate all the facts above.

83.    Virginia Code section 40.1-33.2 prohibits an employer from retaliating against an employee who has filed a complaint or claim for unpaid wages.

84.    I engaged in protected activity by repeatedly complaining to management about defendants' failure to pay wages due, including through my formal written memorandum of August 14, 2025. My subsequent NLRB charges and DOLI filing on February 13, 2026, were a direct, foreseeable continuation of the same unresolved wage complaint.

85.    Defendants retaliated against me for asserting my wage rights by:
(a) suspending me without pay on September 18, 2025;
(b) terminating me on November 12, 2025, approximately five hours after learning I had filed an NLRB charge;
(c) pressuring my coworkers to cease communication with me; (d) failing to pay all wages due at the time of my separation; and (e) refusing to provide me with commission wage statements despite my written demand on November 14, 2025, in violation of Va. Code section 40.1-29(C).

86.    Defendants retaliatory conduct was knowing, willful, and undertaken with the purpose of punishing me for exercising my statutory right to demand payment of wages owed.

87.    Pursuant to Va. Code section 40.1-33.2, I am entitled to recover all lost wages, benefits, and other remuneration, together with interest, as well as reasonable attorney's fees and costs.

88.    I am additionally entitled to recover all unpaid wages due under Va. Code section 40.1-29, plus treble damages for Defendants' knowing violations pursuant to Va. Code section 40.1-29(J), plus reasonable attorney fees and costs.

15

## COUNT III
### FRAUD – SYSTEMATIC COMPENSATION MANIPULATION
### (Virginia Common Law)

89.  I incorporate by reference all preceding paragraphs as if fully set forth herein.

90.  This count encompasses two related schemes through which Defendants fraudulently manipulated my compensation: (A) systematic suppression of customer service multipliers across multiple performance periods, and (B) systematic reassignment of rental agreement revenue I had originated to other employees' commission ledgers. The evidentiary detail and legal framework supporting this count is set forth below.

### Count III-A: Fraud by Misrepresentation
### (Commission Multiplier Suppression)

91.  Wojcik and Roberts generated compensation documents that reflected $0.00 in customer service multiplier amounts for performance periods in which I demonstrably qualified for the multiplier based on Defendants' own written NPS scoring thresholds. Wojcik transmitted these documents to me as accurate representations of my earned compensation, with congratulatory messages, while zeroing out a bonus his own threshold table showed I had earned.

92.  I reasonably relied on these compensation documents. They carried the company template, were transmitted by my District Manager, and contained no disclaimer of any kind. I continued my employment and refrained from seeking immediate legal relief because Wojcik actively encouraged me to work through internal channels, promising resolution that never came.

93.  The suppression was deliberate. The same $0.00 entries appeared across at least three consecutive performance periods in 2025 and extending back to at least August 2023, consistently in Defendants favor, administered by the same person who designed the plan and controlled every calculation within it.

94.  As a direct and proximate result, I suffered a documented minimum underpayment of $6,208.46 across Performance Periods 5 through 7, with

16

additional amounts for prior periods to be established through discovery.

## Count III-B: Fraud by Conversion

## (Rental Agreement Revenue Diversion)

95.    Defendants' employees, including Newton Carey, Kathy Delridge, and Mesky Downing, closed my active rental agreements and reopened them under their own names, diverting my revenue to their commission ledgers. Each diverted contract falsely represented to Defendants'   payroll and commission systems that another employee, rather than I, had originated the transaction.

96.    Defendants' management, including Wojcik and Roberts, was on actual written notice of this scheme and failed to investigate, discipline the responsible employees, or implement corrective measures.

97.    At least three specific incidents are documented, with a combined documented loss of approximately $2,695 The full scope of diverted revenue can only be determined through discovery. The detailed incident descriptions are set forth in the accompanying Support Memorandum

### Integrated Pattern and Punitive Exposure

98.    The multiplier suppression scheme and the contract reassignment scheme operated in concert to compound the damage to my compensation. Defendants' conduct was willful, deliberate, and sustained over multiple performance periods despite actual written notice. Punitive damages are warranted.

99.    I am entitled to compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## COUNT IV

## FRAUD – FABRICATION OF INVESTIGATIVE RECORD

## (Virginia Common Law)

**100.** I restate the facts above as part of this count.

**101.** Mangal created the handwritten document for the purpose of constructing a pretextual basis for termination. The dishonesty narrative is what the defendants used to deprive me of my progressive discipline rights under the collective bargaining agreement.

**102.** On September 18, 2025, Mangal asked me to provide a written statement regarding a complaint. I provided him with a written email explanation. Mangal printed that statement and had me sign it. By asking me to write, sign, and submit a statement, Mangal represented that my signed account would be the operative document in the investigation. I relied on that signed, truthful statement to exonerate me. I had given an honest account and reasonably believed the defendant's decision would be based on my signed statement.

**103.** During the October 2nd disciplinary meeting, I noticed all the questions Wojcik asked me were based on "what you said" to Mangal and not at all on what I wrote. Wojcik seemed frustrated when I repeatedly referred to my signed written statement.

**104.** It wasn't until January 21, 2026, when the Virginia Employment Commission Deputy presented me with evidence used to terminate my employment.

**105.** Mangal's handwritten document was the only thing given to VEC as the basis for the dishonesty narrative that Wojcik used as justification in terminating my employment without progressive discipline.

**106.** Virginia Employment Commission process allowed me to present my signed written account. I did so. Upon VEC seeing all the documents, they independently determined the defendants' accounts failed to establish misconduct on my part.

**107.** I am entitled to compensatory damages and, because Mangal's fabrication of an investigative record was a willful, deliberate, and affirmative act of fraud, I am entitled to punitive damages.

## COUNT V

### VIRGINIA WHISTLEBLOWER PROTECTION
### (Va. Code section 40.1-27.3)

**108.** I incorporate by reference all preceding paragraphs as if fully set forth herein.

**109.** Virginia Code section 40.1-27.3 prohibits an employer from retaliating against an employee who in good faith reports a violation of federal or state law to a supervisor or governmental body.

**110.** I engaged in protected activity by:

(a) reporting to management my good-faith belief that Defendants were committing wage theft in violation of the Virginia Wage Payment Act and the FLSA;

(b) providing a formal written memorandum on August 14, 2025;

(c) filing an NLRB charge on November 10, 2025;

(d) disclosing to Mangal on November 12, 2025, that I had filed an NLRB charge; and

(e) reporting through my NLRB filings my good-faith belief that Defendants had fabricated records.

**111.** Defendants' retaliated against me by:

- suspending me on September 18, 2025;
- terminating me on November 12, 2025, approximately five hours after Mangal received notice of my NLRB charge;
- pressuring coworker Nicky to block my communications on December 24, 2025; and
- withholding relevant documentation despite my written demand.

**112.** Defendants retaliatory conduct was willful and intentional.

19

113.   Pursuant to Va. Code section 40.1-27.3, I am entitled to recover lost wages, reinstatement or front pay, compensatory damages, and reasonable attorney fees and costs.

# COUNT VI
## UNAUTHORIZED WAGE DEDUCTIONS
### Va. Code section 40.1-33.1

114.   All facts stated above apply here too.

115.   Virginia Code section 40.1-33.1 prohibits employers from making unauthorized deductions from an employee's wages.
Defendants made at least two categories of unauthorized deductions from my wages without my written authorization and without any lawful basis:

**Overtime Clawback**

116.      The pay period of July 19 to August 1, 2025, Defendants reduced my pay by negative twelve (12) overtime hours. Defendants ignored my requests for an explanation

**Sick Pay Manipulation**

117.   During the pay period of May 10 to May 23, 2025, Defendants recorded my sick day absence but failed to pay sick time. After I complained, Defendants added 8 hours of sick pay but simultaneously deducted 8 hours from my regular hourly wages, resulting in zero net correction. This offsetting deduction was unauthorized and made without my written consent.

118.   Defendants' unauthorized deductions were knowing and intentional.

119.   Pursuant to Va. Code section 40.1-29(J), I am entitled to recover treble the amount of wages unlawfully withheld, together with prejudgment interest, reasonable attorney fees, and costs.

20

# PRAYER FOR RELIEF

I respectfully ask this Court to enter judgment in my favor and against Avis Budget Group, Inc., Avis Budget Car Rental, LLC, and AB Car Rental Services, Inc., jointly and severally, and award the following relief:

I. Reinstatement to the position I was in on September 18th, 2025, with all unpaid wages, overtime, commissions, and bonuses owed to me, including suppressed customer service multipliers totaling a documented minimum of $6,208, and diverted rental agreement commission credits totaling a documented minimum of $2,695 with additional amounts to be proven through discovery;

II. Lost wages, benefits, and other remuneration under Va. Code section 40.1-33.2, together with interest;

III. Treble damages under Va. Code section 40.1-29(J) for knowing wage violations, including unauthorized deductions under Va. Code section 40.1-33.1;

IV. Liquidated damages under the Fair Labor Standards Act, 29 U.S.C. section 216(b);

V. Compensatory damages for lost wages, lost benefits, and emotional distress;

VI. Punitive damages for Defendants willful and fraudulent conduct;

VII. Injunctive relief prohibiting Defendants from retaliating against, intimidating, or interfering with the communications of any current or former employee who is a potential witness in this action;

VIII. Pre-judgment and post-judgment interest at the maximum legal rate;

IX. Reasonable attorney fees and costs of this action;

X. All remedies available under Va. Code section 40.1-27.3; and

XI. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

I demand a trial by jury on all issues so triable.


Respectfully submitted,


_____

Michael Mwamba, Pro Se

February 27th, 2026.

13720 Atlantis St., Apt. 558                          Telephone: (301) 408-8410

Herndon, VA 20171                                    Email: michaelmwamba@me.com

FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

2026 FEB 27 P 3: 44

**MICHAEL MWAMBA,**

Pro Se Plaintiff,

v.

**AVIS BUDGET GROUP, INC.,**

**AVIS BUDGET CAR RENTAL, LLC,**

and

**AB CAR RENTAL SERVICES, INC.**

Defendants

Civil Action No. _____

## GHOSTWRITING CERTIFICATION
*Pursuant to Local Civil Rule 83.1(M)*

I, Michael Mwamba, am appearing pro se in this action. Pursuant to Local Civil Rule 83.1(M) of the Eastern District of Virginia, I hereby certify as follows:

No attorney has prepared, or assisted in the preparation of, this document or any other document filed or to be filed on my behalf in this action.

I have drafted all filings in this matter myself. No attorney reviewed, edited, or approved these filings. All factual allegations are based on my personal knowledge. All legal arguments and strategic decisions are my own.

I understand that as a pro se litigant, I am responsible for complying with the Federal Rules of Civil Procedure, the Local Rules of this Court, and all applicable law.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 2/27/2026

_____
Michael Mwamba, Pro Se Plaintiff
13720 Atlantis Street, Apt. 558
Herndon, VA 20171
Phone: (301) 408-8410
Email: michaelmwamba@me.com