FILED

06/22/2026

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

MICHAEL MWAMBA,
Plaintiff,

v.

CASE NO: 1:26-cv-00599-PTG-WBP

AVIS BUDGET GROUP, INC.,
AVIS BUDGET CAR RENTAL, LLC,
And
AB CAR RENTAL SERVICES, INC.,
Defendants.

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### PRELIMINARY STATEMENT

1. I am Michael Mwamba. I bring this First Amended Complaint against the three Avis Budget Group entities that employed me, controlled my pay records, suppressed my compensation, retaliated against my wage complaints, and let my discipline reach Avis customers.

2. I worked as a Rental Sales Agent and subsequently as a Preferred Services Representative, for Avis at its rental car operation at Washington Dulles International Airport. I sold rentals, earned commissions, and hit the customer service scores that triggered my customer service multiplier. Avis paid me on some rentals and zeroed out the multiplier on the records it controlled.

3. When I documented the underpayment and complained, Avis suspended me, fired me for "dishonesty," and allowed the replacement Mangal hand-picked to tell customers I got in trouble.

4. This amended pleading supersedes my original Complaint and clarifies and reorganizes my claims. Where any claim is pleaded in the alternative, it is pleaded that way because Rule 8(d) expressly permits alternative pleading, not because I

1

concede any defense. I concede none, including Defendants' assertion that Virginia law cannot reach their conduct at Dulles.

5. My claims arise under the Fair Labor Standards Act, Virginia common law, and Virginia statutory wage law. The federal claims apply because Avis employed me in covered interstate-commerce activity and is subject to federal wage-and-retaliation law. The Virginia claims also apply.

6. Defendants are a private employer that operate as a car-rental concessionaire[1] on designated commercial grounds at Washington Dulles International Airport. Defendants are not the Metropolitan Washington Airports Authority, they are not the United States, and they are not a sovereign entity.

7. Avis posted and continues to maintain Virginia labor-law notices, including Virginia wage and employee-rights protections, in the employee break rooms at Dulles. Its own workplace conduct treats Dulles as a Virginia-regulated employment site, not a Virginia-law-free zone.

## PROCEDURAL HISTORY

8. Before filing this lawsuit, I pursued a union grievance beginning on or about September 30, 2025, then filed unfair labor practice charges with the National Labor Relations Board beginning November 10, 2025 (Case Nos. 05-CA-374722 and 05-CB-375051), November 14, 2025 (Case No. 05-CA-374924), and subsequently filed wage and retaliation claims with the Virginia Department of Labor and Industry.

9. I filed my original Complaint in this action on February 27, 2026.

10. On April 15, 2026, the Court issued summonses for all three Defendants for service by the United States Marshals Service. (ECF No. 7.)

11. All three Defendants were served on April 27 and 28, 2026. The same law firm, Littler Mendelson, represents all three. Avis Budget Car Rental, LLC and AB Car Rental Services, Inc. were served through the same shared registered agent, Corporation Service Company.

---

[1] Title 49, Section 23.3 of the Code of Federal Regulations defines airport concessions to include for-profit businesses selling services to the public at an airport, including car-rental companies with an airport counter or ready-return facility, regardless of whether the operating arrangement is labeled a lease, sublease, permit, contract, subcontract, or other instrument.

12. On May 12, 2026, Defendants' attorneys reached out to me seeking my consent to a two-week extension of the response deadline. The next day, this Court granted a consent motion extending the time for Avis Budget Group, Inc. and Avis Budget Car Rental, LLC to respond to my Complaint until June 1, 2026. (ECF No. 13.)

13. AB Car Rental Services, Inc., the entity Defendants identify as my direct payroll employer, did not join that motion and did not respond by its May 18, 2026 deadline.

14. After I obtained proof of service directly from the U.S. Marshals Service, on May 28, 2026, I physically handed copies of the executed returned summons to the Clerk's office. Subsequently docketed as ECF 19.

15. On May 29, 2026, I requested that the Clerk's office enter "a default entry" against AB Car Rental Services, Inc. for its failure to respond. (ECF No. 25.)

16. On June 1, 2026, Littler Attorney Meredith Schramm-Strosser filed AB Car Rental Services, Inc.'s opposition to my request for entry of default (ECF 20). AB Car Rental asked the Court to extend its own deadline to June 1, 2026, the same day its two co-Defendants' responses were due. Its sole explanation, supported only by a declaration of Defendants' own counsel, was that the notice of service had been marked a "second copy" by the shared registered agent and was apparently mistaken for a duplicate of the service on Avis Budget Car Rental, LLC.

17. Defendants' handling of service mirrors the joint-employer structure alleged in this Complaint. Defendants share a registered agent and one law firm, acted in concert after service was made, and treat the lines between the entities as fluid when doing so benefits them. They invoke those same corporate lines when casting AB Car Rental Services, Inc. as my only employer. They cannot operate as one enterprise for convenience and as three unrelated strangers for defense.

18. That same day, all three Defendants jointly filed a Motion to Partially Dismiss (ECF 21) and supporting memorandum (ECF 22), this time through the attorney of record, Ms. Goetzl. Central to the defendant's defense is this fiction that Avis's commercial concession agreement to operate at Dulles subjects it to federal enclave laws and immunizes them from the state and federal employment statutes under which I sue.

3

19. On June 15, 2026, the Court denied my request for entry of default against AB Car Rental Services, Inc. and granted that Defendant additional time to respond, treating its opposition as a motion to set aside default under Rule 55(c).[2]

20. I file this First Amended Complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1). This amended pleading supersedes my original Complaint.

## PARTIES

21. I am a 46-year-old male resident of Virginia.

22. Defendant Avis Budget Group, Inc. ("ABG, Inc.") is a Delaware corporation with its headquarters in Parsippany, New Jersey. It is the parent holding company.

23. Defendant Avis Budget Car Rental, LLC ("ABC, LLC") is a Delaware limited liability company and the primary operator of the Avis rental car business at Dulles.

24. Defendant AB Car Rental Services, Inc. ("ABCR") is a Delaware corporation. It issued my pay through ADP and is my employer of record.

25. The three Defendants ("Avis") acted directly or indirectly in the interest of one another with respect to my employment and functioned as my joint employers. They shared management, operational control, compensation administration, discipline, and termination authority over the Dulles rental car operation.

26. Under the economic realities of my employment, all three Defendants were my employers and joint employers. They shared:
    - The power to hire, fire, suspend, and discipline: Avis Budget Group managers suspended me, signed my termination on Avis Budget Group letterhead, and controlled my discipline.

    - Supervision and control of the work and its conditions: Airport Manager Moslem Mangal and District Manager John Wojcik directed my schedule, my assignments, and the conditions of my work across the Dulles operation.

---

[2] This is not a minor paperwork issue. Defendants' own filings say AB Car Rental Services, Inc.'s service notice was supposedly mistaken for a duplicate notice for Avis Budget Car Rental, LLC. Yet Defendants also told the Court that I was never employed by Avis Budget Car Rental, LLC and that AB Car Rental Services, Inc. was my employer. Defendants therefore ask the Court to excuse their failure to respond for the only employer entity by relying on an alleged confusion with a non-employer entity. The Court did not appear to address that contradiction when treating AB Car Rental Services, Inc.'s opposition as a Rule 55(c) request. That contradiction bears directly on whether AB Car Rental Services, Inc. showed good cause.

- Determination of the rate and method of pay: Wojcik built, controlled, and manually entered the adjusted commission plan that set my pay, and Avis's support management administered the payroll and Wizard systems that recorded it.

27. Maintenance of employment records: AB Car Rental Services, Inc. issued my pay through ADP as the payroll employer, while Avis Budget Group, Inc. and Avis Budget Car Rental, LLC controlled the pay records, the Wizard system, and the CSI data. Avis Budget Car Rental, LLC is the primary operator of the Dulles rental operation.

28. All three Defendants share common management, premises, a single registered agent, and a single law firm; and they codetermined the essential terms of my employment. They were not disassociated. They functioned as a single integrated enterprise.

29. John Wojcik ("Wojcik") District Manager at IAD, controlled the adjusted Preferred Services bonus spreadsheets, admitted multiplier errors, handled my grievance, and signed my termination letter.

30. Moslem Mangal ("Mangal") Airport Manager at Dulles, supervised me, received my written wage complaints, handled the September 18, 2025 suspension meeting, selected my replacement in Preferred Services, and participated in the November 12, 2025 termination.

31. Jordan Roberts ("Roberts") was my Sales Performance Manager at the Dulles location. He was responsible for staff sales coaching, generating Performance Commission Reports, and correcting and entering sales contracts into Avis's internal compensation systems. Roberts calculated the bonuses, generated the performance reports that reflected reassigned revenue, and was on written notice of my wage complaints. He acknowledged discrepancies in writing and took no corrective action.

32. Newton Carey ("Carey") was the Support Manager at the Dulles location and the primary technical administrator of payroll-adjacent systems, including the Wizard rental management system. His authority extended beyond his nominal title: he exercised the ability to unilaterally delay, deny, and modify commission-related transactions and agent attributions after the fact. Carey participated in the diversion of my rental agreement revenue, conducted a campaign of

5

repeated demands for my immigration documents without lawful basis, and after my termination pressured my coworkers to cease communications with me.

33. Kathy Delridge ("Delridge") was the Union Shop Steward at the Dulles location and a member of Teamsters IBT Local 922. She was responsible for representing employees in grievance proceedings. Delridge had a direct financial conflict of interest in my case: she was among the employees who reassigned my active rental agreements to her own commission ledger. When I contacted her about filing a grievance after my suspension, she declined to assist. She subsequently attempted to participate in my Step 1 grievance meeting over my objection. Avis's management was aware of Delridge's conduct and took no disciplinary action against her.

34. Tim Brown ("Brown") was the President of Teamsters IBT Local 922, the union representing employees at the Dulles location. Brown participated in my Step 1 grievance meeting on October 2, 2025 as the union representative. At the October 22 appeal meeting, Brown stated he had not acted on my behalf because I had consulted with an attorney, and told me that the employer "does not have to follow the steps precisely" and could "move forward even with my appeal." Brown was a named recipient of Wojcik's October 15, 2025 grievance-denial letter, which published the charge of "dishonesty & theft" to him as a third party outside Avis management.

35. The suspension and termination documents were issued on Avis Budget Group letterhead or through Avis Budget Group management titles. Whatever label Avis attaches to ABCR's payroll role, ABG-side managers controlled the pay records, discipline, investigation, and termination that caused my damages.

36. I use "Avis" in this Complaint to refer to the Defendants jointly where their conduct was joint. Where a specific entity or person acted, I name that entity or person.

## JURISDICTION AND VENUE

37. This Court has federal question jurisdiction under 28 U.S.C. § 1331 over my claims under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

38. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over my Virginia common law and Virginia statutory claims, which arise from the same facts.

6

39. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to my claims occurred at Dulles, in Loudoun County and Fairfax County, Virginia.

40. Defendants are private business entities. None of them is the United States or the Metropolitan Washington Airports Authority ("MWAA").

41. I performed services at Washington Dulles International Airport, but the challenged pay decisions were not confined to physical work at the airport counter. ABCR issued payroll through ADP; compensation inputs, manual bonus adjustments, pay codes, deductions, and pay corrections were created, transmitted, stored, or implemented through Avis's payroll and management systems; and I received my wage statements and wages through those payroll processes.

42. Congress authorized Virginia to have concurrent police power authority over the Metropolitan Washington Airports. 49 U.S.C. § 49111(c).

43. Virginia expressly accepted that concurrent police-power authority. Va. Code § 5.1-158(A). The governing structure separates three actors: the United States as lessor and landowner; MWAA as airport tenant and operator under the federal lease; and Defendants as private commercial car-rental operators. MWAA's own delegation records identify the Dulles car-rental contracts as Authority concession and service agreements covering private operators, including Avis and Budget.

44. Virginia wage law applies to the payroll conduct I challenge. The deduction decisions, pay-code entries, and nonpayment of recorded wages at issue were private payroll acts of a private concessionaire (made and implemented through Avis's off-enclave corporate payroll systems), and Congress has in any event expressly preserved the Commonwealth's concurrent police power authority over the Metropolitan Washington Airports. 49 U.S.C. § 49111(c).

45. I do not allege that Defendants share any immunity or jurisdictional status belonging to MWAA or the United States.

46. Avis operates the Dulles rental car business as a private concessionaire pursuant to airport authorization and operating rules.

7

47. Avis withheld Virginia income tax from my wages, paid Virginia unemployment taxes, and treated me as part of their Virginia workforce.

48. The payroll records, deductions, sick-pay entries, overtime entries, and correction decisions challenged in this action were made or implemented through Avis's own compensation systems and payroll processes.

49. In all events, my claims under the Fair Labor Standards Act arise under federal law and are asserted regardless of the applicability of any Virginia wage statute.

50. To avoid any ambiguity, my Virginia statutory wage count does not seek Preferred Services commissions, customer-service multipliers, or diverted-rental revenue.

51. I plead the Virginia statutory wage count in the alternative because Rule 8(d) permits alternative pleading, not because I concede any defense to it.

## FACTUAL ALLEGATIONS

### A. My Employment and My Compensation

52. I started working for Avis on June 20, 2022, as a Rental Sales Agent at its rental-car operation at Washington Dulles International Airport ("Dulles").

53. In July 2023, Avis moved Preferred Services from the main rental counter to a separate standalone building within the rental-car concession site assigned to Avis's Dulles operation. Of all the Rental Sales Agents, I was the only one who agreed to move to the newly built Preferred booth on the condition I would be on an "adjusted" commission incentive plan. From then until my suspension, I worked exclusively in Preferred Services, serving primarily Avis Preferred and business rental customers.

54. My pay had two parts. The first was an hourly wage governed by the collective bargaining agreement between Avis and Teamsters Local 922. The second was commission tied to my sales revenue and my customer service scores, including a customer service multiplier.

55. The adjusted commission plan was created and administered by John Wojcik, the District Manager as an incentive to work in the Preferred booth. As far as I know, only two other employees were/are on the "Adjusted Commission Plan," Kamaria Smith and Ansam "Nikki" Ahmed Falahy.

8

56. The collective bargaining agreement does not contain or govern the plan's terms: Article 30 of the agreement reserves to the Company only the right to implement, modify, or discontinue an incentive program, and sets no rates, thresholds, formulas, eligibility criteria, or payment terms. The rates, NPS thresholds, booth tiers, and computation of my commission and multiplier existed only in plan documents and spreadsheets Wojcik created and controlled, outside the collective bargaining agreement.

57. The collective bargaining agreement identifies the "Company" as "Avis Budget Car Rental Services, LLC" (an entity name that does not precisely match any Defendant), executed by Eric Pollack, Director of Labor/Employee Relations, and refers throughout its text to bargaining-unit employees as "ABCRS Employees" (e.g., its 401(k) provisions). My payroll employer of record is AB Car Rental Services, Inc.; my hourly wage was set by a labor agreement signed under a different entity name; my termination letter issued on Avis Budget Group letterhead. Avis's own documents do not maintain the corporate lines they invoke in this litigation. The signatory name matches no Defendant precisely and, on information and belief, refers to one or more of them.

58. The multiplier was calculated from my Medallia customer-service feedback results, specifically the score reported for "Helpfulness of the staff at the time of pick up," expressed on an NPS-style scale. Under Avis's own written threshold table, a score of 40.0 to 49.9 qualified for a 5% multiplier, and a score of 50.0 or above qualified for a 10% multiplier.

59. I had no independent access to the systems that generated my pay. Avis exclusively controlled the Wizard rental system that recorded my transactions, the Medallia platform that recorded my customer service scores, the CSI Portal that projected my payouts, and the spreadsheets and payroll inputs built from them. Every number on my pay statements originated in systems Avis controlled.

60. In or about January or February 2024, after I explained the Preferred Services commission structure to Kamaria Smith, Wojcik told me in a one-on-one meeting in his office that I should not have discussed my commission structure with her and that I could not talk about my booth compensation arrangement with her or with others. Avis kept the terms of my compensation opaque while exclusively controlling the records that showed what I had earned.

## B. Avis Suppressed My Customer Service Multiplier

61. Beginning in August 2023, I noticed differences between the pay I earned and the pay Avis recorded. Because Avis controlled the underlying data and denied me access to it, I could not at that time verify the differences or attribute them to anything other than error.

62. Wojcik built the adjusted booth-tier spreadsheets and sent them to me by text message to my personal phone, presenting them as the compensation statements for completed performance periods.

63. For performance periods from August 2023 through at least December 2024, those spreadsheets zeroed my customer-service multiplier in varying ways: in some periods the spreadsheet reported my score as 0.0; in others it reported a qualifying score with $0.00 in the adjacent multiplier column; and in at least one period (Performance Period 6 of 2024), the spreadsheet reported a score of 0.0 and "10%" in the "Multiplier % Achieved" column at the same time, while paying $0.00.

64. Avis's own Medallia platform showed that my customer service scores qualified during those same periods, and Avis's CSI Portal projected payouts above what Avis paid me.

65. On August 23, 2023, while reviewing and discussing my customer service feedback with then Operations manager, Asmaa Bouzcri ldrissi, I photographed the Medallia dashboard displayed under the login of then Avis Airport Manager Danielle Harrington, screen filtered to my agent ID 28621: it showed my "Helpfulness of the staff at the time of pick up" score at 57.7, well above the 10% threshold.

66. On April 17, 2024, my Performance Manager, Jordan Roberts, texted me a photo of the same dashboard, again filtered to my agent ID, showing 42.1, again well above the 5% threshold.

67. On March 19, 2024, Wojcik admitted in writing, when sending me a spreadsheet, that the formulas were broken.

68. On May 2, 2024, Wojcik acknowledged in writing that the NPS amount had been left out of my pay and said I would receive the difference. On the same day, Roberts sent me a series of individual Medallia customer responses crediting my agent ID with scores of 8, 9, and 10 out of 10. Each photograph is time-stamped.

69. Wojcik then submitted a correction, but he did not cure the underpayment: he issued $158 across two periods, less than the underpayment for one period alone. The partial payment led me to believe corrections were coming through Avis's internal process.

70. The suppression is visible on the face of Wojcik's own documents. His spreadsheet for Performance Period 6 of 2024 (June 2024) is internally broken: its detail rows credit $0.00 of my $4,842 coverage revenue, jams $14,263 into a tier capped at $7,199.99, and omit the top tier of my $16,647 accessory revenue. Yet its own summary boxes compute the correct tier values, totaling $4,144.33. Its multiplier box simultaneously reports my score as "0.0," reports "10%" as the multiplier achieved, and pays $0.00, zeroing approximately $414.43 the sheet itself concedes.

71. Avis's payroll then paid even less than the broken sheet computed. The ADP statement issued August 2, 2024 (voucher 0000304754) attributes $2,729.98 of "Cntr Sale Inc" to the period May 25 through June 28, 2024, which is $1,414.35 less than the $4,144.33 Wojcik's own sheet computed and $1,828.78 less than the total including the multiplier the sheet shows as achieved. The FLSA overtime true-up on that statement ran only on the underpaid amount.

72. The suppression continued into 2025. I qualified for the multiplier in Performance Periods 5, 6, and 7 (April through July 2025). Wojcik's spreadsheets for those periods showed qualifying scores alongside $0.00 in the multiplier column, and he transmitted them with congratulatory messages such as "Nice month!" and "PP6 Booth Tiers. Nicely done sir," while the documents zeroed out the payouts.

73. On or about August 14, 2025, Wojcik texted me congratulating me on a good month for Performance Period 7 and acknowledged that he had forgotten to add my 10% customer service multiplier, which came to approximately $426. He said he would send me an additional $54 to make up for it, leaving $372 unpaid. My August 14, 2025 written memorandum to Mangal recorded my Performance Period 7 results: total revenue of $48,822 and a customer-service score of 72.2, far above the 10% threshold.

74. The error always ran in Avis's favor. Across every documented period, the multiplier was zeroed against me, never for me.

75. My documented multiplier suppression is a minimum of $6,208.46 across Performance Periods 5 through 7 alone, with the full amount to be proven from Avis's Medallia, CSI Portal, and payroll records. I cannot state the exact figure because Wojcik refused to provide my CSI wage statements after Performance Period 7 (Section C below).

## C. Avis Failed to Process My Commissions and Withheld My Wage Statements

76. During Performance Period 7 (06/07/25 to 07/04/25), I discovered discrepancies between my actual revenues and what appeared on the Performance Commission Reports generated by Jordan Roberts, the Sales Performance Manager. Roberts acknowledged by text that contracts I had timely submitted were not processed and said they would "carry-forward" to Performance Period 8.

77. On or about August 5, 2025, Roberts confirmed by text that he had entered my contracts for Performance Period 8, reporting total revenue of $14,599.82, and said the last six contracts could not be entered "due to time" and would "go towards the next pay period."

78. On or about August 14, 2025, Roberts confirmed he had transferred those contracts into Performance Period 9.

79. My documented claim itemizes $12,125 in unprocessed counter sales commissions (Section N below).

80. Wojcik refused to provide me with my CSI wage statements for Performance Periods 7, 8, 9, and 10, before and after my written demand of November 14, 2025.

81. Avis published my performance while withholding my statements. On September 8, 2025, Roberts posted the Performance Period 9 "Top 100" and "Podium" results to the IAD team. The company-generated Top 100 attached to his post listed me by name ("IAD / MICHAEL MWAMBA") among its recognized producers. Yet in his accompanying message, Roberts congratulated seven IAD colleagues by name and celebrated Kathy Delridge for "making the Podium," and did not mention me, although I appeared on the very list he was circulating. Roberts, the manager who calculated the bonuses, recognized by name the colleagues who benefited from my reassigned revenue while omitting the producer whose statements were being withheld.

82. Ten days after Avis published that recognition, Avis suspended me.

## D. Avis Diverted My Rentals

83. Avis personnel (including Support Manager Newton Carey, Union Shop Steward Kathy Delridge, lead agent Mesky Downing, an agent known to me as Adda, and District Manager John Wojcik himself) closed or took over my active rental agreements and reopened or renewed them under their own names, diverting the revenue and commission credit from my ledger to theirs. This occurred from no later than July 2023 through at least September 2025, including while I was suspended.

84. These were completed or active rentals I had originated; the commission credit on them was earned, not contingent or future compensation.

85. Carey, as Support Manager, was the primary technical administrator of payroll-adjacent systems at Dulles and had working authority in Wizard to modify agent attributions and transaction records after the fact.

86. Roberts calculated the bonuses and generated the Performance Commission Reports that reflected the reassigned revenue. After I flagged the diversions to him, his reports continued to adopt the diverted attributions.

87. The documented diversion incidents include the following; each reflected on Avis's own receipts and Wizard records:

88. Richardson (October 2023). I rented a vehicle to repeat President's Club customer Geordie Richardson (Rental Agreement 923832265; "Your vehicle was rented to you by MICHAEL"). On October 23, 2023 at 6:00 p.m., while the vehicle was out on movement, Support Manager Newton Carey prematurely checked the rental in ("checked in by NEWTON"). Eleven minutes later, at 6:11 p.m., the same customer and same vehicle were reopened on Rental Agreement 923827763 ("rented to you by ADDA") with estimated charges of $2,710.98 booked away from my ledger. When I confronted them, Carey dismissed it as "maybe an error"; Adda responded in writing, "I used Danielle's # and you saw it." On November 8, 2023, I reported the incident to Wojcik in writing, told him it had also happened in July, and stated I had handed all the contracts to Danielle Harrington. Wojcik replied that he would get the facts.

13

89. Forsythe (September–October 2024). Christopher Forsythe, a President's Club renter since 2018 whom I had served repeatedly, had his monthly renewal written under Kathy Delridge's name (Rental Agreement 939550555, September 27 to October 27, 2024; "rented to you by KATHY"; $2,091.20). The original contract I opened (Rental Agreement 752460752, $2,148.73) was quietly prematurely closed with a note in the remarks saying, "MANUALORIGRATEPERJOHN" (a manual rate set per District Manager Wojcik).

90. Park/Volvo (September 2025). My monthly business customer Eunjo Park (Volvo Group Truck Purchasing) rented from me on August 9, 2025 (Rental Agreement 385398333; "rented to you by MICHAEL"; $3,206.81). On September 8, 2025 (the same day Avis published my name on its Top 100, and ten days before my suspension), the renewal was written by Wojcik himself (Rental Agreement 385398344; "rented to you by JOHN"; $3,206.81).

91. Article 28 of the collective bargaining agreement ("Supervisory Employees") permits only Management Trainees to be assigned to rental counters, and only for up to thirty days. A District Manager and a Support Manager writing, closing, and re-attributing rental agreements in their own names is exactly the supervisory capture of bargaining-unit, commission-bearing work that Article 28 exists to prevent.

92. I reported the diversions to Wojcik and Roberts repeatedly. They acknowledged the reports and did nothing. Each diverted contract reduced my reported revenue, which in turn suppressed my commission calculations, my multiplier eligibility, and my leaderboard rankings.

93. The specific diverted agreements are reflected in Avis's Wizard, CSI, and audit records, which Avis exclusively controls.

## E. Avis Shorted My Hourly Pay and Sick Leave

94. During the pay period of July 19 to August 1, 2025, Avis reduced my pay by twelve overtime hours in two components ($226 of straight time and $113 of FLSA overtime premium, a combined $339), without lawful basis, without my written authorization, and without explanation despite my requests for one.

95. During the pay period of May 10 to May 23, 2025, I timely called out sick for my May 14, 2025 shift. Avis recorded the absence but did not pay the sick time I earned.

14

96. After I complained, Avis added eight hours of sick pay and simultaneously deducted eight hours of regular pay, leaving the wages still withheld.

## F. Carey Demanded My Immigration Documents, Again and Again

97. Newton Carey constantly singled me out over issues that had nothing to do with my job performance or work. He repeatedly harassed me about my work outfits, even though Avis had not provided uniforms as the collective bargaining agreement required. After I pushed back, he shifted the focus to my green card, even though I am a lawful U.S. permanent resident. Avis participates in the U.S. Department of Homeland Security's E-Verify program. At the time I was hired, I completed all the requisite steps online without any issues. I had already been verified as authorized to work. I understood his conduct as intimidation and harassment, not a legitimate work-authorization issue.

98. Beginning in or about April 2025, Support Manager Newton Carey began a campaign of repeated demands that I re-present my employment authorization documents to him personally. On April 17, 2025, Carey texted me: "I need to make a back copy of your employment authorization." On April 23, 2025, he texted the same demand again, adding "Please see me when you start today."

99. A few weeks prior to these written demands, Carey said something in person about my work authorization. I happened to have my permanent resident card in my wallet. I showed it to him and told him I did not need "authorization to work." Carey looked at my permanent resident card and took a picture of it on his iPhone. He then continued to demand that I produce the documents again so that he could photograph the back of it or copy them again.

100. No other employee, to my knowledge, was subjected to repeated demands to re-present employment authorization documents to the Support Manager, and no legitimate reverification event existed: my documents were unexpired and my work authorization was not in question.

101. Rather than submitting to Carey's demands, I uploaded the documentation through Avis's official channel: in April 2025, I opened an HR4U Request (Document No. 667079) through the Workday and HR4U system. When Carey repeated his demand on April 23, 2025, I responded: "I uploaded it to HR4U last week."

102.    Carey's repeated document demands had no connection to any I-9 reverification obligation and exceeded any documentation request permitted by law. They were directed at me in the same period in which I was pressing complaints about unpaid wages and commission suppression, and they were carried out by the same Support Manager who administered the Wizard and payroll-commission systems, who could modify agent attributions after the fact, and who later pressured a coworker to block contact with me after my termination.

## G. I Complained, In Writing, Again and Again

103.    On or about May 31, 2025, I described my pay issues by text message to Brett Oswald, an Avis Operations Manager. Oswald responded confirming that he, Wojcik, was aware of the situation.

104.    My requests for my own compensation records predate 2025. In December 2024, I texted Wojcik asking for the printouts of the adjusted booth tiers for the prior two performance periods. The request went unanswered.

105.    On July 18, 2025, I pressed Roberts in writing about the Performance Period 6 discrepancies, noting he had acknowledged the issue but had not fixed it, and asking whether it would be rectified.

106.    On or about July 21, 2025, I again raised the bonus and revenue reporting issues in writing with Roberts, who calculated the bonuses.

107.    I also gave management a written memorandum about Performance Period 7: the official leaderboard had credited a lower-revenue Dulles agent as the recognized performer in a category in which I had produced more, because my recorded revenue had been cut.

108.    The distortion is visible on Avis's own station-ranking printouts, which Roberts generated and circulated about every other day. On the September 8, 12, 13, 14, 16, and 19, 2025 printouts, my customer-service revenue per rental exceeded the station average in every snapshot (on September 8 it was 131.29 against a station average of 65.83, among the highest at the station), yet I was printed at or near the bottom of the roster, dead last on September 12, 13, and 16, below agents with a fraction of my per-rental figures. My position moved from day to day while my underlying numbers barely changed, and my score cell was

16

printed blank while Avis's Medallia system held my qualifying scores. No printed metric explains the ordering.

109. On August 14, 2025, I gave Moslem Mangal, the Airport Manager and my direct supervisor, and Roberts a written memorandum titled "Payroll and Revenue Reporting Issues," documenting the erroneous overtime deduction, the sick-pay nonpayment, the unprocessed commission contracts, the suppressed NPS multipliers, and the distorted performance records.

110. Between August 14 and September 18, 2025, I verbally followed up with Mangal at least every other day. I worked physically near Mangal's office.

111. On August 29, 2025, I received a paycheck with net pay of $2,709.13, although the projected payout statement Wojcik had texted me, his "PP8 Booth" spreadsheet, showed a projected total CSI payout of $6,051.31, and showed "10%" in the multiplier-achieved column beside a blank score cell and a $0.00 multiplier. With the multiplier the sheet itself shows as achieved, the projection was $6,656.44. The pay statement (Document No. 201768301) shows the CSI component actually processed was $2,920.30. Avis's own CSI Portal showed a third, different figure for the same period: $1,756.69. I texted Wojcik immediately: "My actual CSI payout amount is significantly less than the projected payout statement you sent me." He acknowledged "the discrepancy," said "I will get on it," and requested information he already had access to. I provided it anyway. He never provided a resolution or corrected payment.

112. On September 9, 2025, Wojcik came to the Preferred Services booth and told me he would "make sure he got to the bottom of the issues" within three days. My coworker Darlene was present. It was the last substantive communication I had with Wojcik before my suspension.

113. On or about September 15, 2025, because Wojcik was avoiding me, I told Mangal, in the presence of my coworker Nicky, that I intended to pursue other options for escalation to resolve my complaint.

## H. Three Days Later, Avis Suspended Me

114. On September 18, 2025, three days after I told Mangal I would escalate, nine days after Wojcik's self-imposed deadline passed without resolution, and ten days after Avis published my name on its Top 100, Mangal texted me to come to his office.

115.    Mangal asked me to provide a written statement regarding a complaint about a rental transaction, a customer who had rented a car for more than 30 days and had also dealt with an Avis branch in New Jersey. I wrote the statement on my laptop in his office and emailed it to him. Before looking at my statement, Mangal asked whether I wanted a witness present. He suggested Mesky Downing, one of the same employees who had been reassigning my rental agreements to her own ledger, after I declined, he offered to call Kathy Delridge, the shop steward, another of the employees who had been doing so. I instead requested my coworker Arthur Mosely, who is not a Union steward. Mangal agreed, and Mosely joined us.

116.    I drafted the statement myself, signed it, and it was truthful. The same day, I separately sent Mangal a written incident report explaining the Fort Lee customer service situation and what I did and did not do.

117. Mangal also prepared handwritten notes of the September 18 meeting. I was never shown those notes, never given an opportunity to review or correct them, and never signed them. The notes record Mangal's own paraphrases of answers he attributes to me, and I dispute their accuracy. They were prepared by a manager who later participated in my termination. Avis first produced those notes in January 2026, in another proceeding.

118.    After I emailed my statement, Mangal told me this was a very serious matter and that Avis was suspending me without pay while it investigated, despite my having no disciplinary history in over three years of employment. The suspension notice said only that Avis was investigating alleged "unauthorized rental transactions." It identified no transaction, no date, no policy, and no specifics, although Article 8, Section 2 of the collective bargaining agreement requires written notice "of a specific charge." Under Article 8, Section 3, warning notices are void after twelve months; I had none, void or otherwise.

119.    The suspension was delivered at the end of my shift; my two scheduled days off, September 19 and 20, followed immediately.

120.    Mangal hand-picked Jefferson to replace me in Preferred Services. On September 21, 2025, three days after the suspension, a Preferred Services customer texted me that Jefferson had told him I "got in trouble" and was "suspended for like a week." Avis gave Jefferson access to information about my

suspension, and Jefferson passed it to a customer who had asked only whether I was working.

## I. The Investigation Relied on a Fort Lee Record I Could Not Have Created

121. On or about October 2, 2025, a Step 1 grievance meeting was held by Zoom. Present were Wojcik, HR Business Partner Marlon Spencer, Union President Tim Brown, and me.

122. At the start of the meeting, I asked that my preferred witness, my coworker Arthur Mosely, be allowed to join. Wojcik refused, saying that Tim Brown was there from the Union and that was enough.

123. Kathy Delridge, the shop steward, tried to join the October 2 meeting. I declined her participation: when I had contacted her by text on September 26, 2025 about filing my grievance, she had told me she was too busy and referred me to the Union president.

124. Wojcik said he was reading from Mangal's notes of the September 18 meeting, the same handwritten notes I was never shown and never signed. He said there were discrepancies between the times I said I had performed certain activities and the times reflected in the system, including entries timed at 2:00 a.m. I explained that a system timestamp does not establish that I took an action at that time: Wizard records some actions autonomously, at least one of Avis's systems can be accessed offsite, and someone else may have entered my agent ID, intentionally or not.

125. Wojcik questioned me about Rental Agreement 429298881. I presented the Wizard audit trail for that agreement. It showed my agent ID, 28621, used to open a rental at the Fort Lee, New Jersey location (F11) on August 24, 2025 at 12:25 p.m.

126. I have never worked at, and have never physically been to, the Fort Lee location. I did not and could not have created that agreement. My agent ID was manually entered by someone physically at Fort Lee. At the time, the rental agreement number prefixes in use at Fort Lee are not the prefixes in use at Dulles.

127. I also presented a vehicle trace report showing a flurry of irregular system activity on the vehicle between August 22 and August 29, 2025, entries recorded autonomously by Wizard showing someone at Fort Lee and someone at Dulles

19

acting in concert: Fort Lee initiating the record, and Dulles accepting or finalizing it.

128. At least three surveillance cameras are mounted directly above my workstation at the Dulles counter. When Mangal first questioned me about the alleged "unauthorized rental transactions," I asked him to review the footage from those cameras. Mangal said he would review the footage and get back to me. He never produced it, never told me what it showed. That footage was at all times within Avis's exclusive control, and it would have confirmed or refuted the termination letter's central allegation that I entered transactions while not present and while not punched in.

129. Wojcik did not address or explain the Fort Lee evidence. The meeting ended abruptly. I offered to meet in person; Wojcik refused.

130. On or about October 5, 2025, I escalated in writing to Jeff Hogan, Avis's Area Vice President. The letter gave Hogan written notice of my suspension and of my unresolved complaints (missing pay, payroll discrepancies, suppression of my customer-service scores, contracts taken from my ledger, including a contract flipped into Mesky Downing's name while I was suspended, and distorted revenue and performance records), stated my intent to pursue legal action, and offered Avis a final opportunity to resolve the matter. Hogan never responded.

131. On October 15, 2025, Wojcik denied my grievance in writing, citing "dishonesty & theft." That letter was addressed to me, Teamsters IBT Local 922, Shop Steward Kathy Delridge, and Local 922 President Tim Brown, publishing the 'dishonesty & theft' charge to union officials outside Avis's management structure. Wojcik, the same District Manager who personally controlled my compensation spreadsheets, whose suppression I had documented and complained about, and who had a direct personal interest in the outcome, served as the sole decision-maker.

132. Wojcik's October 15 decision also asserted that "we have not heard back from Michael." That was false. My written escalation to Avis's Area Vice President (dated October 3 and sent on October 5, 2025) had been in Avis's hands for ten days. Wojcik's own letter also recorded that on October 3 I had stated I was consulting with attorneys before proceeding. That entry puts Avis on written notice of my legal consultation 40 days before it terminated me.

133.    In the same October 15 written response, Avis admitted that:
- Preferred Booth agents receive a monthly manual bonus adjustment, entered by hand and submitted to corporate once per month;
- Preferred Booth agents may supply evidence of sales they modified onto rentals and receive credit for them, a sanctioned way to earn the bonus, not dishonesty;
- adjustments and re-submissions had been necessary to correct my bonus from a prior pay period. Avis thereby conceded my pay had been wrong and required correction;
- Wojcik acknowledged in writing that my complaint that others had stolen my sales was a topic "to be looked into appropriately", yet he treated it as "separate" from my suspension and took no corrective action.

134.    On October 17, 2025, I filed a written appeal under Article 9 of the collective bargaining agreement, detailing the Fort Lee audit-trail evidence and challenging the "dishonesty & theft" finding as unsupported.

135.    On or about October 22, 2025, an appeal meeting was held by Zoom. Under Article 9 of the collective bargaining agreement, a Step 1 grievance is heard by the Airport Manager and/or designated Operations Manager, and Step 2 is an appeal to the District Manager. Avis instead installed the District Manager, Wojcik, as the Step 1 decision-maker, so my Article 9 appeal ran to the same person who had issued the decision under appeal. No higher authority reviewed it. Step 3 of Article 9 (submission to the Region Manager and, if unresolved, arbitration) was never reached. The call ended abruptly.

136.    Before the October 22 meeting, Wojcik told me I could bring Arthur Mosely as a witness but said the meeting would take place within the hour. Mosely was out of town at a family gathering, and I attended without a witness of my choice.

137.    At the October 22 meeting, Wojcik showed me the system reports I had presented on October 2 and asked where I had obtained them. I told him I had pulled them from Avis's own system, to which I still had access: Mangal had told me I could not come onto the premises, but no one had told me I could not access the system. Wojcik said I was not allowed to access the system. I told him I had no further reason to.

21

138.    I asked Wojcik to explain how my agent ID had been used at the Fort Lee, New Jersey location. Wojcik did not explain. Instead, in words or substance, he asked me who I thought had used my agent ID. I answered that I did not know. Before my termination, the sole decision-maker thus acknowledged that the identity of the person who used my agent ID was an open question, and he terminated me anyway, without ever answering it.

139.    Wojcik also asked me, in words or substance, how I thought the New Jersey agents felt about me "stealing" their rental contract. Of which, I told him I had not done that, but that I knew exactly how it felt, because Mesky had stolen a contract from me while I was suspended. Wojcik asked Marlon Spencer whether he had any questions for me; Spencer had none.

140.    No written decision on my appeal was ever issued. From October 22 to November 12, 2025, I heard nothing from Avis about the grievance, the appeal, or my employment status.

## J. Avis Terminated Me Five Hours After Learning of My NLRB Charge

141.    On or about November 10, 2025, I filed a charge with the National Labor Relations Board, Case No. 05-CA-374722. The charge arose directly from the same unresolved wage complaints described above.

142.    On November 12, 2025, at 12:03 p.m., Mangal called me regarding my personal rental car, a matter unrelated to my employment, a two-minute call reflected on my iphone's call log. At 12:14 p.m., I texted Mangal the NLRB's e-filing confirmations for my charges (including Confirmation No. 1108179799 for the charge against Avis, filed November 10, 2025) together with photographs of the charge filing, and we spoke again briefly. Mangal responded that he would talk to Wojcik.

143.    At 4:12 p.m. I asked Mangal by text what Wojcik had said about my suspension. Mangal answered: "I haven't spoken to him regards to it." I replied: "Ask him and let me know." At 5:08 p.m. (fifty-six minutes later, on a one-minute call reflected on my call log), Mangal called me with Wojcik on speakerphone. Wojcik told me the investigation was concluded and that I was terminated. No appeal decision had ever issued. I was terminated the same business day I told my manager about the NLRB filing, within five hours of the disclosure, and within the hour of Mangal being asked to raise it with Wojcik.

144. On the termination call I asked for a copy of the termination letter and asked Wojcik to email it to me. Wojcik said he could not; Mangal jumped in and offered to, and I received the letter approximately 24 hours later. Article 8, Section 2 of the collective bargaining agreement permits discharge only "by proper written notice to the employee"; Avis terminated me orally, by telephone, and produced written notice only afterward. The letter, dated November 12, 2025, was signed by Wojcik, and Avis sent a copy to Teamsters Local 922.

145. The letter charged me with misconduct on rental transactions in August 2025, describing delay-opened and backdated rental agreements numbered 929474685, 926236441, and 929475035, tied to an original Fort Lee, New Jersey agreement numbered 418665866. It invoked the Company Code of Conduct, the work rules, and Article 8, Section 2 of the collective bargaining agreement (the dishonesty clause, under which no warning notice is required). The dishonesty exception in Article 8, Section 2 dispenses only with the prior written warning; it does not dispense with the just-cause requirement (Article 8, Section 2 and Article 7(A)) or with proper written notice. It also charged me with unauthorized use of company tools, equipment, or property and directed me to return all company property immediately, while identifying none.

146. At the two October meetings, I demonstrated to Wojcik and Spencer that agreements the investigation relied on were ones I could not have created, including Rental Agreement 429298881, which was opened under my agent ID at the Fort Lee, New Jersey location where I have never worked. Avis then omitted from the November 12 termination letter the agreements I had disproved at those meetings, including 429298881, while terminating me on the agreements that remained. By dropping the items I had refuted and keeping the rest, Avis treated the result as fixed regardless of whether the underlying allegations held up.

147. Marlon Spencer, the Human Resources Business Partner, had been copied on the September 18, 2025 suspension letter. The November 12, 2025 termination letter was signed by Wojcik alone, with no HR signature and no HR copy. The manager who could not answer his own question(s) about who used my agent ID terminated me without HR sign-off, and with no decision on my appeal ever issued.

## K. The "Not Scheduled to Work" Statement Is False on Avis's Own Payroll Records

148.    The November 12, 2025 termination letter, signed by Wojcik, states that I took the actions described in the letter on August 18 and August 19, 2025 "while you were not punched in or scheduled to work."

149.    Avis's own payroll records contradict that statement. On September 5, 2025, ABCR issued my pay statement for the period August 16 through August 29, 2025 (Document No. 201782544). For the workweek of August 16 through August 22, 2025 (the workweek containing August 18 and August 19), that statement records 39 regular hours at $18.85 per hour, 2.4167 overtime hours paid at the straight-time rate, and the FLSA half-time premium paid on those same 2.41 overtime hours. In total, Avis's payroll system recorded 41.65 hours of work in that single workweek.

150.    An employee does not work 41.65 hours, and does not earn statutory overtime, in a workweek in which he is not scheduled to work. Avis's own timekeeping and payroll systems recorded me as an active, scheduled employee who worked more than a full-time week, including overtime, during the very week the termination letter claims I was not scheduled to work.

151.    On August 19, 2025, I worked a scheduled evening shift that ended near midnight. A customer message timed 3:01 p.m. is consistent with my 3:00 p.m. start; Mangal directed work tasks to me by text during the shift; and my own 8:04 p.m. message places me at my workstation.

152.    A geotagged photograph taken at 11:38 p.m. on August 19, 2025 places me in the employee parking lot at Washington Dulles, away from any rental counter, fourteen minutes before the 11:52 p.m. transaction described in the termination letter. I did not key the 11:52 p.m. transaction. It was attributed to my agent ID while I was leaving the property.

153.    My agent ID could be used by other personnel. The Support Manager who administered the Wizard payroll-commission systems at Dulles could delay, deny, modify, and re-attribute transactions after the fact. By August 2025, following one manager's resignation and another's transfer, the Support Manager closed the operation on most nights. The records identifying the terminal, workstation, and login session for each transaction described in the termination letter are in Avis's exclusive possession.

154. In the alternative, and to the extent any transaction described in the termination letter occurred at a moment when I was not punched in, the letter is a written admission by Avis that I performed compensable work for their benefit (opening, closing, and modifying revenue-generating rental agreements in Avis's Wizard system) without compensation. Avis suffered or permitted that work within the meaning of 29 U.S.C. § 203(g).

155. I plead the foregoing in the alternative as Rule 8(d)(2) permits. Either I was scheduled and punched in, in which case the stated ground for my termination is false, or I was performing unpaid compensable work that Avis accepted, recorded in its own systems, and now characterize as misconduct rather than compensate.

156. At the time Wojcik signed the termination letter, Avis possessed the timekeeping records, posted schedules, and payroll data for the August 16 through August 29, 2025 pay period, including the records reflected in the September 5, 2025 pay statement. On information and belief, Wojcik, as District Manager with authority over scheduling, timekeeping, and the commission plan, had access to those records when he signed the letter.

157. The "not punched in or scheduled to work" statement was false when made. It appeared in a letter that accused me of dishonesty and of acting "with the intent of defrauding the Company," that invoked Article 8, Section 2 of the collective bargaining agreement ("Dishonesty (no warning notice need be given)") to bypass progressive discipline, and that was copied to Teamsters Local 922, publishing the accusations to a third party.

158. The same letter was signed by the same manager, Wojcik, who built and controlled the adjusted commission plan, entered the $0.00 multiplier figures, admitted formula errors in writing on March 19, 2024 and May 2, 2024, and served as the sole decision-maker on my grievance. The manager whose pay suppression I complained about authored the document that called me dishonest.

159. Avis's own documents do not agree on their anchor timestamp: the termination letter places the August 19 transaction at 11:52 p.m., while Mangal's handwritten notes place the creation of Rental Agreement 926236441 at 11:53 p.m.

25

My date-stamped, geolocated photograph places me in the employee parking lot fourteen to fifteen minutes before either time.

160.    The functions the termination letter characterizes as misconduct are functions Avis itself trained me to use. Avis's own training records, produced with its Work Rules in another proceeding, show Avis enrolled me in courses including "Performing a Vehicle Exchange," "Applying Sub Reason Code 006 Rate Defaults," and "Researching Contract Exceptions." And agent IDs at Dulles were routinely entered by Managers and lead agents other than the named agent.

## L. The Termination Charges Are Impossible on Avis's Own Records

161.    The transactions the letter attacks involved a single repeat Preferred Services customer, whom I had served for years. Multiple agreement numbers existed because the contract had to be adjusted to resolve the customer's complaint about the originating Fort Lee branch.

162.    Avis's theory (that I manipulated rental records to inflate my counter sales and my compensation) cannot be squared with Avis's own conduct or records. The transaction paid me nothing, and Avis was simultaneously zeroing the customer service multiplier on the very compensation it claims I schemed to inflate.

163.    The delay-open and backdating functions the letter describes are ordinary functions of Avis's Wizard system. Where I used them, I used them openly, under my own agent ID, to align a contract with the actual rental period. Where my name or agent ID 28621 appears on agreements originated at Fort Lee, it was entered by personnel at Fort Lee, not by me.

164.    The transactions the letter treats as misconduct arose from an ordinary customer-service situation involving a longtime customer of mine. The customer had been dissatisfied with the Fort Lee, New Jersey branch and its agent, was brought to me at Dulles, and asked me to close his Fort Lee contract and rent him a vehicle at Dulles. I did exactly that, and I reported it in my contemporaneous September 18, 2025 statement to Mangal. The customer repeatedly told me that he wanted to meet with Wojcik to confirm that I had acted as he requested. At our second October meeting, I told Wojcik this. Wojcik said nothing and never arranged to hear from the customer.

165.    On November 14, 2025, I wrote to Avis demanding:

(1) identification of the company property it believed I possessed;

(2) an explanation of how to submit my outstanding sales contracts for final pay processing and;

(3) my CSI projected payout and commission wage statements for Performance Periods 7 through 10.

166. Avis never responded to any part of the demand. Shortly after my September 18, 2025 suspension, I had received a CSI commission payment of approximately $7,000, with no calculation statement at the time identifying which performance periods or amounts it covered. I later obtained the statement: it issued September 26, 2025 (Document No. 206295983), with net pay of $7,717.98, reflecting $8,645.30 in CSI commissions for the period August 2 through August 29, 2025. On November 21, 2025, after my termination, I received a final paycheck of $167 by direct deposit, again with no pay statement.

## M. Avis Did Not Apply Its Rules to Anyone Else

167. Avis's stated zero tolerance for dishonesty was selectively applied. Kathy Delridge openly and routinely drove her personal rental car to the Avis pumps to refuel it using company fuel. This conduct is documented in text messages: in December 2024, then-Operations Manager Brett Oswald wrote to me, "I'll catch her again and talk to John." She was never suspended, never terminated, and in fact favored by Wojcik and Roberts.

168. Delridge also reassigned my active rental agreements to her own commission ledger. The same decision-maker, Wojcik, applying the same dishonesty rule, did not suspend her, terminate her, or remove her from commission-related work. Instead, on September 8, 2025, Avis publicly congratulated her ("Congratulations to Kathy for making the Podium!") in the same period it was preparing to brand me dishonest.

169. The selective application extended to management itself. Avis terminated me for "unauthorized rental transactions" while its own District Manager and Support Manager wrote, closed, and re-attributed rental agreements in their own names, conduct outside the narrow authorization of Article 28 of the collective bargaining agreement and directly contrary to the rule applied to me.

27

Wojcik himself wrote the September 8, 2025 renewal of my own customer's rental.

170.   On or about December 24, 2025, my former coworker Nikki told me that Newton Carey had been pressuring her throughout her shift to block my phone number and cease all communication with me. Avis's interference with my access to witnesses continued after my termination.

171. On November 19, 2025, the same Preferred Services customer texted me that he had heard I was no longer at Avis. Word of my discipline and removal had spread to the customers on whom my professional reputation depended.

## N. Damages

172.   On or about February 13, 2026, I submitted to the Virginia Department of Labor and Industry a documented claim itemizing approximately $16,330 in gross unpaid wages and improper deductions across four categories: $490 in unauthorized paycheck deductions (the $339 overtime reversal and the sick-pay offset); $3,342.18 in commission shortfall for August 2025; $372 in customer-service multiplier underpayment; and $12,125 in unprocessed counter sales commissions ($9,852 across forty-five logged counter-sale transactions, plus four diversion entries totaling $2,273). On March 2, 2026, the Department responded that the overtime, paid-leave, and commission components were outside its jurisdiction under Virginia law and advised that the claims be pursued through a private right of action. This action follows.

173.   In addition, my documented minimums include: $6,208.46 in suppressed customer-service multipliers for Performance Periods 5 through 7 of 2025; $1,828.78 for Performance Period 6 of 2024 (the $1,414.35 gap between Wojcik's own sheet and the ADP payment, plus the $414.43 multiplier the sheet shows as achieved); $605.13 for the zeroed Performance Period 8 (2025) multiplier (10% of the $6,051.31 Wojcik's sheet projected); the corresponding FLSA overtime true-ups that were never run on the suppressed amounts; and approximately $2,695 in diverted commission revenue, separate from the diversion entries itemized above, with full amounts to be proven from Avis's Medallia, CSI Portal, Wizard, pay-engine, and audit records, which Avis exclusively controls and which Avis refused to produce in response to my November 14, 2025 written demand.

28

174. My lost wages and benefits from September 18, 2025 forward accrue at approximately $1,923 per week and continue to accrue.

175. After and because of the termination, I was forced to take a hardship withdrawal from my AB Car Rental Services retirement savings plan to cover living expenses. The early-withdrawal penalty, the resulting tax liability, and the projected lost growth on the liquidated funds are consequential damages of the termination, presently estimated at approximately $43,847 and to be proven precisely from plan and tax records.

## COUNT I
### RETALIATION IN VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (29 U.S.C. §§ 215(a)(3), 216(b)), All Defendants

176. I incorporate each preceding paragraph as if fully set forth here.

177. The Fair Labor Standards Act prohibits an employer from discharging or otherwise discriminating against an employee because the employee has asserted rights protected by the Act, including complaints about unpaid overtime compensation.

178. Before Avis suspended and terminated me, I engaged in protected activity by complaining about wage-and-hour violations covered by the Act. On July 18, 2025 and again on or about July 21, 2025, I complained in writing that Avis was shorting my pay by failing to credit compensation I had earned. In my Performance Period 7 memorandum and in my August 14, 2025 written memorandum to Mangal, I challenged unpaid overtime hours and the omission of earned nondiscretionary compensation from payroll and from the calculations affecting my overtime pay. On August 29, 2025, I texted Wojcik that my CSI payout was far below the payout statement Avis had provided and asked that the shortfall be corrected. These complaints were sufficiently clear to put Avis on notice that I was asserting wage-and-hour rights, including my right to full overtime compensation. My September 30, 2025 grievance submission included my written summary of the issues titled "Violation of Article 8 of the Union Contract, FLSA & VA State Law", an express, written invocation of the Fair Labor Standards Act, in Avis's hands seven weeks before the termination.

29

179.    Avis knew of my protected activity because I made those complaints directly to Roberts, Mangal, and Wojcik, the managers who controlled or influenced the compensation, investigation, and termination decisions challenged in this action.

180.    Avis took materially adverse action against me. They suspended me without pay on September 18, 2025, removed me from my Preferred Services role, replaced me, and terminated my employment on November 12, 2025.

181.    The timing and decisionmaker involvement support causation. My August 2025 wage complaints preceded my September 18, 2025 suspension by weeks. Wojcik, who received and acknowledged my pay complaints, later handled the grievance and signed the termination letter.

182.    The termination itself followed protected activity by hours, and on the decision-maker's side by minutes. On November 10, 2025, I filed NLRB Charge 05-CA-374722, which arose directly from the same unresolved wage complaints. At 12:14 p.m. on November 12, 2025, I told Mangal of the filing and sent photographic confirmation. At 4:12 p.m., Mangal told me in writing that he had not yet spoken to Wojcik; I asked him to do so. At 5:08 p.m., fifty-six minutes later, Wojcik terminated me by telephone, although no decision on my pending appeal had ever issued. On either reading (five hours from disclosure, or under one hour from the decision-maker learning of it), the timing supports a direct inference of retaliatory causation.

183.    Avis's stated dishonesty rationale was pretext. The same management that controlled my pay records and admitted multiplier-calculation errors suspended and terminated me after I repeatedly challenged the underpayment of my wages and overtime compensation.

184.    The stated grounds for the termination were false, as demonstrated by Avis's own payroll and timekeeping records (Section K above), and the falsity of the stated grounds is evidence that those grounds were a pretext and that the true reason for the termination was my protected activity. Pretext is further shown by the decision-maker's own conduct: before terminating me, Wojcik asked me who I thought had used my agent ID, an acknowledgment that authorship was an open question, and Wojcik then signed the termination letter alone, without HR signature and without any appeal decision. Avis also terminated me for transactions it claimed I entered while absent and not punched in without ever

30

reviewing the surveillance footage above my workstation, footage I had asked Mangal to review on September 18 that would have confirmed or refuted my presence and that remained in Avis's exclusive control throughout.

185. Avis's retaliation also included a pattern of materially adverse actions during the same period as my wage complaints: Support Manager Carey's repeated, baseless demands that I re-present my immigration documents (Section F above); the withholding of my wage statements and compensation records despite repeated requests, beginning no later than December 2024; the manipulation of circulated performance rankings to print me at the bottom of the roster while my per-rental performance exceeded the station average, with my score cell left blank (Section G above); the continued diversion of my customers and contracts, including while I was suspended; the disclosure of my discipline to my own customers by the replacement Mangal hand-picked (Sections H and M above); and, after termination, pressure on a coworker to sever contact with me. Each act was materially adverse, and together they would dissuade a reasonable employee from asserting wage-and-hour rights. The same managers who received my complaints and controlled my pay records carried out this conduct, and it is imputable to Avis.

186. Avis acted willfully. As a direct and proximate result of Avis's retaliation, including this pattern of materially adverse actions, I suffered economic harm and substantial emotional distress, humiliation, and reputational injury. I am entitled to lost wages, liquidated damages, reinstatement or front pay, compensation for the harms caused by Avis's retaliatory campaign, and all other legal and equitable relief available under 29 U.S.C. §§ 215(a)(3) and 216(b).

## COUNT II
### UNPAID OVERTIME IN VIOLATION OF THE FAIR LABOR STANDARDS ACT (29 U.S.C. §§ 207, 216(b)), All Defendants

187. I incorporate each preceding paragraph as if fully set forth here.

188. The FLSA required Avis to pay overtime at one and one-half times my regular rate.

189. My regular rate had to include my nondiscretionary commissions and earned customer service multipliers.

190. Avis suppressed or omitted that nondiscretionary pay before it reached payroll.

31

191. Because the omitted pay belonged in my regular rate, Avis underpaid my overtime in the weeks I worked overtime, and Avis's own pay records show the mechanism. In the second workweek within the pay period of May 10 to May 23, 2025 (pay statement document 195350673, issued by AB Car Rental Services, Inc.), I worked 50.55 hours, including 10.55 hours over forty. My base hourly rate was $18.85. Avis paid my overtime premium for that week at $9.43 per hour, which is exactly one-half of $18.85. That rate shows Avis used my bare hourly rate as my regular rate and left my nondiscretionary commissions and my earned customer service multiplier out of it. The same pay statement carries a separate "CSI" commission line and a separate "OT Lookback" line, which is the code Avis uses to true up overtime when it later credits nondiscretionary pay. Because Avis suppressed and zeroed my commissions and my multiplier, my regular rate was never increased, and neither the overtime premium nor the OT Lookback true-up was ever paid on the suppressed pay. The full amount of my overtime underpayment, across every week I worked overtime while Avis suppressed my commissions and multiplier, can be computed from Avis's pay records.

192. Avis's own termination letter states that I performed rental transactions while "not punched in." That statement is a written admission that Avis suffered or permitted compensable work for which I was not paid, including in workweeks in which I had already worked more than 40 hours, as Avis's payroll records for the workweek of August 16 through August 22, 2025 (41.65 recorded hours) confirm.

193. Avis's own payroll mechanics confirm the cascade. When commissions actually posted, Avis's system ran retroactive weekly FLSA overtime true-ups on them, as its own statements show for 2022, 2024, and 2025. When commissions were suppressed, zeroed, or diverted, no true-up ever ran. The overtime premium owed on the suppressed amounts is computable from Avis's records, and where Avis's records are incomplete, by just and reasonable inference.

194. Avis's violation was willful, which extends the limitations period to three years under 29 U.S.C. § 255(a).

195. I am entitled to unpaid overtime, liquidated damages, and costs.

## COUNT III

32

## ACTUAL FRAUD (Virginia common law), All Defendants

196. I incorporate each preceding paragraph as if fully set forth here.

197. At all relevant times, John Wojcik acted within the scope of his authority as District Manager and supplied or controlled compensation figures used by Avis in the administration of my Preferred Services pay.

198. On March 19, 2024, by text message to my personal phone, Wojcik sent a Preferred Services spreadsheet for a completed performance period representing that my Net Promoter Score was 0.0 and that my customer-service multiplier was $0.00.

199. On May 2, 2024, by text message to my personal phone, Wojcik again transmitted compensation figures to me and acknowledged that the Net Promoter Score amount had been left out.

200. Similar texted spreadsheets were sent for Preferred Services performance periods from August 2023 through at least December 2024, each reporting a zero or omitted customer-service multiplier for periods in which Avis's own Medallia and CSI records showed that I qualified for payout.

201. The documented examples span both years of the scheme: the Performance Period 6 (2024) spreadsheet reporting a 0.0 score, "10%" achieved, and $0.00 paid; the Performance Period 5 (2025) spreadsheet reporting a qualifying 45.0 score beside a $0.00 multiplier; and the Performance Period 8 (2025) spreadsheet projecting $6,051.31 with a blank score cell, "10%" achieved, and $0.00 paid. Each was transmitted to me as the compensation statement for a completed period, several with congratulatory messages.

202. These statements were representations of present material fact, namely the compensation I had earned for completed performance periods under Avis's compensation structure.

203. The statements were false when made. Wojcik knew they were false, or acted with reckless disregard for their truth, because he controlled the spreadsheets and later admitted that the formulas were broken and that the Net Promoter Score amount had been omitted.

204. Wojcik made the misrepresentations with the intent that I accept the underpaid amounts shown on the spreadsheets and continue working without

33

receiving the compensation I had earned. My reliance was also to my detriment in concrete ways: I remained in the Preferred Services assignment I had accepted on the condition of the adjusted plan, continued generating revenue for Avis, and forbore from escalation and legal action while Avis's promised corrections were purportedly in process.

205.    I reasonably relied on the initial spreadsheets because Avis held exclusive control over the backend data, denied me direct access to Medallia and related systems, and presented the spreadsheets as final compensation statements for completed periods.

206.    Once I began suspecting discrepancies, my continued reliance remained reasonable because Avis still controlled the underlying records, Wojcik acknowledged errors, promised correction, and continued to supply revised figures as though the issue would be fixed through Avis's internal process. I had no means of auditing any individual period: Avis controlled Medallia, the CSI Portal, and Wizard; it refused my requests for records in December 2024 and again after Performance Period 7 of 2025; and each new spreadsheet was a fresh representation of present fact about a newly completed period that I could not independently verify.

207.    Because I believed Avis's compensation statements and promised corrections, I continued to staff the Preferred Services booth, continued to process the sales and customer transactions that generated revenue for Avis, and delayed escalating the matter outside Avis's internal channels. I did not, for example, refuse the assignment, stop performing the work that generated the disputed commissions, or file suit upon detecting the first discrepancy, because Avis told me the errors would be corrected, and because the relevant systems and records were entirely within Avis's control.

208.    That reliance remained reasonable after I discovered partial errors. Avis's own acknowledgments showed that the discrepancies were real, that the backend data was under Avis's exclusive control, and that the amounts being sent to me were still being represented as the pay for completed periods. Partial discovery of an error did not reveal the full scope of the scheme, and it did not give me a way to verify the accuracy of each new period's statement without Avis's records.

34

209. My reliance was reasonable rather than negligent because the only records capable of revealing the falsity of Wojcik's spreadsheets were in Avis's exclusive possession. Avis controlled the Medallia platform, the CSI Portal, the Wizard system, and the pay engine; I had no independent access to any of them; and Avis refused my requests for those records in December 2024, again after Performance Period 7 of 2025, and again in my written demand of November 14, 2025. A reasonable investigation on my part could not have uncovered what Avis alone could see and would not produce. This is not a case in which a plaintiff who could have verified the facts failed to do so; it is a case in which the party that made the representations held the verifying records and withheld them.

210. Nor did I rely on any representation that contradicted a writing in my own possession. The spreadsheets Wojcik texted me were the only compensation statements I had for the completed periods, and the records that would have exposed their falsity (the Medallia scores, the CSI projections, and the underlying Wizard data) were the very records Avis kept from me. Each spreadsheet was a fresh representation of present fact about a newly completed period; my awareness that earlier periods had been underpaid did not disclose, and could not have disclosed, the true figures for any later period without the records Avis controlled. My reliance on each period's statement was therefore reasonable, and Wojcik's written acknowledgments of error and promises of correction reinforced it.

211. ABG, Inc. is liable because Wojcik, acting as its District Manager and within the scope of his authority, made the misrepresentations and later used the same pay records in the discipline and termination process.

212. Avis Budget Car Rental, LLC is liable because it operated the Dulles concession, used the challenged compensation system in the Preferred Services operation, and maintained or controlled the local inputs and records on which the false statements were based.

213. ABCR is liable because it issued my payroll through ADP on the false figures after notice of the discrepancies and thereby adopted and implemented the misrepresentations in the wages actually paid.

214. After March 19, 2024 and May 2, 2024, Avis did not fully correct the omitted multiplier amounts.

215. The misrepresentations caused me to be underpaid in amounts to be proven from Avis's payroll, Medallia, CSI, and audit records.

216. Avis's conduct was intentional, willful, and in reckless disregard of my rights.

217. Each statement reported what I had already earned for a completed period, a representation of present fact, not a promise of future performance. Count III seeks damages for the deceit itself, the inducement to continue working under false compensation statements and the detriment that reliance caused, not merely the unpaid wages separately recoverable under the FLSA and Virginia wage counts.

218. As a direct and proximate result, I suffered economic loss, including suppressed multiplier pay and related wage losses.

219. I seek compensatory damages and, to the extent permitted by Virginia law, punitive damages.

## COUNT IV
## QUANTUM MERUIT AND UNJUST ENRICHMENT, PLEADED IN THE ALTERNATIVE (Fed. R. Civ. P. 8(d)), All Defendants

220. I incorporate each preceding paragraph as if fully set forth here.

221. I plead this Count in the alternative.

222. I do not seek quasi-contract recovery for hourly wages or for any compensation the Court finds was fixed by an enforceable contract.

223. I seek alternative recovery only to the extent the Court finds that no enforceable contract fixed the amount, method, timing, or correction of the Preferred Services commissions, customer service multipliers, carry-forward revenue, or agent attribution corrections at issue.

224. Avis admitted that the Preferred Booth bonus is a manual adjustment, entered by hand and corrected the following pay period when wrong. That admission supports the alternative inference that no enforceable contract fixed the amount, method, or timing of that compensation.

225. At Avis's request, I performed services, generated revenue, and earned customer service scores in the Preferred Services operation.

226. Avis accepted and retained the benefit of my work and did not pay the reasonable value of the components not governed by an enforceable contract.

227. Avis's retention of that benefit without payment is unjust.

228. I am entitled to restitution, prejudgment interest, and other equitable relief.

## COUNT V
### DEFAMATION PER SE (Virginia common law), All Defendants

229. I incorporate each preceding paragraph as if fully set forth here.

230. Avis published false statements about me to third parties.

231. In the November 12, 2025 termination letter signed by John Wojcik, Avis stated that I was dishonest and that I engaged in unauthorized use of company property. Avis sent a copy of that letter to Teamsters IBT Local 922. Those statements were false. I did not rent the central agreement the letter relied on. Rental Agreement 418665866 was rented by Harshal, a Fort Lee agent. I only checked the vehicle in when the customer returned it to Dulles. My agent ID was used at a Fort Lee location where I have never worked. Avis also directed me to return company property but, when I asked what property it meant, Avis identified none.

232. Separately, Wojcik's October 15, 2025 grievance-denial letter, addressed to Shop Steward Kathy Delridge and Local 922 President Tim Brown, published the charge of 'dishonesty & theft' to those union officials. That publication to third parties outside management is an independent act of defamation per se.

233. Avis's customer-facing publication began before termination. On September 21, 2025, only three days after Avis suspended me, a Preferred Services customer texted me that Jefferson, the employee Moslem Mangal selected to replace me, said I "got in trouble" and was "suspended for like a week." The customer had asked whether I was working. Jefferson had no legitimate business reason to disclose my discipline to a customer.

234. Jefferson's disclosure told the customer that I had been removed from the Preferred Services role for misconduct, not merely that I was absent from work. The statement was especially damaging because it came from the employee Avis placed in my former customer-facing role. After Avis terminated me, the reputational harm continued. On November 19, 2025, the same Preferred

Services customer texted me that he had heard I was no longer at Avis and asked whether it was because I had been helping him. That message shows my discipline and removal had spread to customers in the exact Preferred Services relationship where my reputation was my livelihood.

235.    To the extent Avis claims any of these communications were qualifiedly privileged, Avis abused any privilege and lost it. Avis published the substance of my discipline to customers, who are outsiders with no employment interest and no need to know. The dishonesty and unauthorized-property accusations were made with knowledge that they were false, or with reckless disregard for whether they were true. Wojcik signed the letter calling me dishonest while he held the records showing that my pay had been suppressed and while Avis had not identified any company property I supposedly misused or failed to return. Avis acted to injure me, not to serve any legitimate business interest. The manager whose pay suppression I had documented used the dishonesty label to punish me and to explain away my removal.

236.    The termination letter's statement that I acted "while you were not punched in or scheduled to work" was likewise false, and Avis made it with knowledge of its falsity or with reckless disregard for the truth, because the payroll, timekeeping, and scheduling records contradicting it (including the September 5, 2025 pay statement recording 41.65 hours of work in the relevant workweek) were at all times in Avis's exclusive possession. That statement was published to Teamsters Local 922 together with accusations of dishonesty and intent to defraud, statements that impute the commission of a crime involving moral turpitude and unfitness to perform the duties of my profession. Avis published these accusations while refusing to review the surveillance footage above my workstation, footage I had asked Mangal to review on September 18 and that would have confirmed or refuted them, further showing that Avis published with reckless disregard for whether the accusations were true.

237.    Actual malice is further shown by the decision-maker's own question. Before publishing, as fact, that I had manipulated the transactions, Wojcik asked me who I thought had used my agent ID and received no answer implicating me. He published the accusations anyway, while the contradicting payroll and scheduling records sat in Avis's possession.

238. The statements prejudiced me in my profession and trade. They accused me of dishonesty, misconduct, and unauthorized use of company property in the same customer-facing Preferred Services role where trust, reputation, and customer relationships were central to my work.

239. The statements are defamatory per se. I was damaged in my reputation, my customer relationships, and my ability to find comparable work.

240. This Count seeks damages for the publication of false accusations of dishonesty and misconduct to third parties, the union and my own customers, and for the resulting reputational injury and presumed damages under Virginia law, which are distinct from any wage underpayment.

241. I am entitled to compensatory damages and punitive damages.

## COUNT VI
### UNPAID NON-COMMISSION WAGES AND UNAUTHORIZED DEDUCTIONS (Va. Code Ann. § 40.1-29), PLEADED IN THE ALTERNATIVE, All Defendants

242. I incorporate each preceding paragraph as if fully set forth here.

243. I plead this count in the alternative, as Rule 8(d) permits. Virginia wage law applies to the payroll conduct challenged here for the reasons pleaded above (Congress's express preservation of the Commonwealth's concurrent police power over the Metropolitan Washington Airports, 49 U.S.C. § 49111(c), and Avis's off-enclave payroll decisions), and I concede no defense to it.

244. This count does not seek Preferred Services commissions, customer-service multipliers, or diverted-rental revenue.

245. This count is limited to discrete non-commission wage items reflected in Avis's payroll records: (a) twelve overtime hours removed from the July 19 to August 1, 2025 pay period; (b) the May 14, 2025 sick-pay nonpayment and offset; and (c) paycheck deductions not authorized in writing.

246. ABCR issued payroll through ADP, and Avis used its payroll systems and compensation records to implement the deductions and nonpayments challenged in this count. The deduction and nonpayment decisions challenged in this count were made and implemented through corporate payroll systems

operating off the Dulles enclave, and I received my wages and wage statements off the enclave.

247.    During the July 19 to August 1, 2025 pay period, Avis reduced my pay by twelve overtime hours without lawful basis and without my written authorization.

248.    During the May 10 to May 23, 2025 pay period, Avis recorded my sick leave for May 14, 2025, later added eight hours of sick pay, and offset that entry by deducting eight hours of regular pay, leaving the wages unpaid.

249.    I requested wage-calculation records identifying the challenged entries and deductions, and Avis did not provide the records needed to explain or justify the withholding.

250.    Avis knowingly failed to pay wages when due and made unauthorized deductions, in violation of Va. Code Ann. § 40.1-29. I seek the unpaid non-commission wages, treble damages to the extent authorized for knowing violations, prejudgment interest, costs, and reasonable attorney's fees as the statute permits.

## **PRAYER FOR RELIEF**

WHEREFORE, I respectfully request that the Court:

A.  award unpaid wages and overtime found due;

B.  award liquidated damages under the FLSA as permitted by law;

C.  award back pay and lost compensation caused by my suspension and termination;

D.  award reinstatement with full seniority and lost benefits;

E.  award compensatory damages on my FLSA retaliation claim, including the pattern of materially adverse actions, and on my defamation claim;

F.  award punitive damages on my fraud and defamation claims as permitted by law;

G.  award restitution in the alternative under Count IV;

H.  award prejudgment and post-judgment interest as permitted by law;

I.  order Avis to correct my compensation and personnel records;

J.  enter an injunction prohibiting Avis from suppressing commissions outside documented written plans, from retaliating against wage and hour activity, and from terminating employees without HR review and signature;

K.  award costs and any attorneys' fees later incurred and authorized by statute; and

L.  grant any other relief the Court finds just.

My documented damages floor exceeds $221,000 as of the filing of this First Amended Complaint (comprising accrued lost wages, an equal liquidated amount under 29 U.S.C. § 216(b), the documented economic items above, the documented overtime premium on suppressed commissions, and the retirement-liquidation consequentials), and it accrues at approximately $549 per day. The floor is exclusive of treble, punitive, emotional-distress, and presumed defamation damages. The full amount will be proven from Avis's records.

## JURY DEMAND

I demand a trial by jury on all claims so triable.

Respectfully submitted,

**Michael Mwamba**
*Plaintiff, pro se*

13720 Atlantis St.,
Apt 558
Herndon, VA 20171
(301) 408-8410
michaelmwamba@me.com

**Dated: June 22, 2026**

41

## CERTIFICATE OF SERVICE

I certify that on June 22, 2026, I filed the foregoing and served a copy on counsel for Defendants, Ashley Jones and Katherine Goetzl of Littler Mendelson, via EDSS, the Court's Electronic Document Submission System.

Michael Mwamba
*Plaintiff, pro se*

42

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

MICHAEL MWAMBA,
Plaintiff,

v.

AVIS BUDGET GROUP, INC.,
AVIS BUDGET CAR RENTAL, LLC,
And
AB CAR RENTAL SERVICES, INC.,
Defendants.

CASE NO: 1:26-cv-00599-PTG-WBP

## LOCAL RULE 83.1(N) CERTIFICATION

I declare under penalty of perjury that no attorney has prepared or assisted in the preparation of this First Amended Complaint and Jury Demand.

## FIRST AMENDED COMPLAINT AND JURY DEMAND
(Title of Document)

MICHAEL MWAMBA

_____
(Signature of Pro Se Party)

Executed on: JUNE 22, 2026

1